Baggett *v.* State.

Jan. 18, 1954

No. 38959 49 Adv. S. 1 69 So. 2d 389

584

*Darwin M. Maples, H. G. Rowland,* Lucedale, for appellant.

*John E. Stone,* Asst. Atty. Gen., Jackson, for appellee.

KYLE, J.

M. C. Baggett was indicted, tried and convicted in the Circuit Court of George County on a charge of murder in the killing of Ernest Lee Robinson, who is referred to in the record as "Smokie", and was sentenced to life imprisonment in the state penitentiary. From that judgment he prosecutes this appeal.

The shooting occurred on January 4, 1953, at the Fruitdale Lumber Company camp in the southern part of George County. The State's testimony in chief consisted mainly of the testimony of Willie Mae Conley and Shelby Smith, who investigated the shooting after it occurred.

Willie Mae Conley testified that she and Smokie lived in a house at the camp settlement located only a few feet from the road, and that Tommy Lee Dunniger and Irene Dunniger, who is also referred to in the record as Irene Brown, lived across the road from her. M. C. Baggett lived in a house only a few feet from Willie Mae's house and on the same side of the road, and Marcus Baggett, M. C. Baggett's father, and his family lived in a house located immediately north of and only a few feet from M. C.'s house. Willie Mae stated that she was in her kitchen cooking supper when the difficulty occurred between M. C. and Smokie. She heard someone holler, "You all don't do that." She went to the door and saw Tommy Lee Dunniger and John Willie Lee holding M. C. M. C. said, "Smokie, I'm going to kill you." They were standing between M. C.'s house and Willie Mae's house at that time. Smokie ran over across the road to Tommy Lee Dunniger's house, and when he got across the road M. C. shot him in the back. M. C. was standing between his own house and Willie Mae's house when he fired the shot. Willie Mae said that one bullet entered Smokie's spinal cord. Smokie was taken to the hospital at Luce-

dale, and a few days later was carried to a hospital in Mobile, where he died on January 26.

Shelby Smith, the sheriff, testified that he went to the lumber camp a short time after the shooting occurred to make an investigation. Ernest Hollinghead went with him. When they arrived at the camp, M. C. was standing near the roadside where Smokie had fallen. The sheriff asked who did the shooting, and M. C. said, "I done it, Boss. I couldn't help it. I had to do it." The sheriff stated that M. C. did not have the gun that he had used with him when the sheriff arrived at the camp; but the sheriff later got possession of a shotgun, which M. C. admitted was the gun that he had used when he shot Smokie. The sheriff found a shell between M. C.'s house and Willie Mae's house. The sheriff measured the distance from the place where M. C. was standing when he fired the shot to the place where Smokie fell, and the distance was 57 steps. The sheriff had a rough drawing or diagram which he had made and which he stated was a true representation of the camp settlement, showing the true location of the houses mentioned by him in his testimony; and the drawing, after being properly identified, was offered as an exhibit to the sheriff's testimony. The appellant's attorney objected to the drawing being admitted in evidence; but after the sheriff had inserted the distances between the houses shown on the drawing, the drawing was admitted in evidence as an exhibit to the sheriff's testimony. Ernest Hollinghead testified that he went with the sheriff to the scene of the shooting immediately after the shooting occurred, and assisted the sheriff in making his investigation.

Dr. Louis F. Rittermeyer testified that Smokie was brought to the hospital at Lucedale on the night of January 4; and that he examined him at once. Smokie had three bullet wounds in his body, and was paralyzed from his waist down. The doctor treated him for shock and

dressed his wounds, but did not undertake to remove the shots. From the location of the bullet wounds it appeared that the gun was fired from behind. Doctor Rittermeyer treated Smokie about four days, and then sent him to the hospital at Mobile. Dr. William S. Warren, of Mobile, testified that Smokie was brought to the hospital in Mobile on January 6. He had been shot with a load of buckshot. He was paralyzed from the chest down. One bullet had entered his body under the shoulder blade. He had four holes in the back of his left side and knee. His left leg and foot were cold and swollen. The doctor operated on Smokie and removed fragments of bone that had been knocked off the vertebrae, when the bullet entered the spinal canal. Gangrene developed in Smokie's left leg soon after he arrived at the hospital, and a few days later the leg was amputated above the knee. Smokie died on January 26. In the doctor's opinion the gunshot wounds were the cause of his death.

Pattie Baggett, the mother of the appellant, testified as the first witness for the appellant. Pattie stated that she was in her kitchen cooking supper when the difficulty arose between M. C. and Smokie. M. C. was cutting wood near his house when Smokie came up and offered him some whiskey. Pattie said to him, "Smokie, don't give him none of that whiskey, because I don't want him to have none." Smokie said, "This is my g - - d - - whiskey. * * * Ain't nobody got anything to do with what I do with it." M. C. then said, "Don't talk to my mother like that." Other words were spoken, and Smokie advanced on M. C. with an open knife. M. C. ran, and Smokie pursued him. Finally M. C. ran into his own house. Smokie stopped at M. C.'s door, then turned and crossed over to Irene Dunniger's house. Irene reached for a gun there in her house. Smokie grabbed for that gun. Irene ran out of the house, with Smokie in close pursuit. M. C. called to Smokie, "Smokie, don't

go after that gun no more. * * * If you do, I'm going to shoot you." About that time Smokie reached for the gun that Irene held, and when he did that, M. C. shot him. Pattie stated that at the time the shots were fired Irene and Smokie were standing between the corner of Irene's house and the edge of the road, and that was where Smokie fell.

Marcus Baggett testified that he was at Irene's house when the difficulty started, and that he did not know how it started. He said that he saw Smokie running into Irene's house, and someone said, "Don't let Smokie get my gun." When Smokie came into the house he pushed Irene and grabbed for the gun that Irene had in her hand. Irene ran out the back door, and Smokie ran out behind her. Marcus stated that he heard M. C. say, "Smokie, don't get that gun. If you get that gun, I'm going to shoot you." Smokie then made an effort to get the gun and M. C. shot.

The appellant, M. C. Baggett, testified that he was cutting wood when Smokie came over and offered him a drink of whiskey. He told Smokie he did not want a drink of whiskey. M. C.'s mother then said to Smokie, "Smokie, don't give M. C. none of that whiskey." Smokie said, "G - - d - - you. I'll give my whiskey to who I want to." M. C. then said, "Boy, mind your mouth. I wouldn't talk to your mother like that." Smokie uttered other abusive language; and when M. C. raised up from his wood chopping, Smokie ran his hand in his pocket and pulled out a knife. M. C. ran and Smokie ran after him. M. C. ran into his own house and got his gun. Smokie crossed over to Irene's house and tried to get a gun from Irene. Irene ran out of the house with the gun in her hand, and Smokie followed her trying to get the gun. M. C. called to Smokie and said, "Smokie, you done enough to me—you done enough, and you go and get a gun to hurt me, I am going to shoot you." M. C. said that about that time Smokie made for him,

and "when he did, I shot him. I didn't mean to kill him, I just tried to stop him from killing me." M. C. stated that the shot he used were buckshot. He said that Smokie was a bad man and had already killed a man and had served a five-year sentence in the penitentiary for that. M. C. said that Irene was standing in the front door of her house and had the gun in her hand that Smokie was trying to get from her when he shot Smokie. He admitted that he was standing back of his house 57 steps from Smokie when he shot. T. W. Cornet, the sawmill superintendent, testified that M. C. had worked for him about eight years and had never given him any trouble; and that Smokie had worked for him from time to time during the last five or six years. He stated that Smokie was hard to get along with in some ways; that he knew that Smokie was selling whiskey, and that he had tried to stop him, but had not succeeded in doing so.

The State called Tommy Lee Dunniger as a witness in rebuttal. Tommy Lee testified that he was at his woodpile when the trouble started, and that Irene was in the house. He said that the first thing he saw was M. C. and Smokie running around Marcus Baggett's house. Smokie then ran across the road into Irene's house. He did not know why Smokie was running. Tommy Lee stated that he went over to M. C.'s house and tried to talk to M. C., tried to get him not to shoot Smokie. He stated that Smokie did not have a gun when he came out of Irene's house, and that Smokie was running at the time M. C. shot him. Tommy Lee said that Marcus Baggett was at his own home at the time of the shooting, and not at Irene's house, and that he did not see Irene at all at the time of the shooting. Tommy Lee stated that just before M. C. shot Smokie, he caught hold of him and tried to keep him from shooting, and that M. C.'s brother-in-law tried to hold him also.

Willie Mae Conley was recalled as a witness in rebuttal and testified that Irene was at her house when the shooting occurred, but did not receive a summons to court, and that the appellant did not summons Tommy Lee as a witness. She said that John Willie Lee did receive a summons to court and was present at the time of the trial.

The first point argued by the appellant's attorneys as ground for reversal on this appeal is that the State failed to prove that the alleged crime was committed in George County, Mississippi. ██ But we think that the venue was properly proved. Willie Mae Conley testified that the shooting took place at the camp settlement of the Fruitdale Lumber Company, which is referred to by some of the witnesses as "Mr. Canet's camp." Willie Mae described the location of the houses referred to by her and later referred to by the other witnesses, including the house that she occupied, which was only a few feet from the road, and the houses which were occupied by M. C. Baggett, Pattie Baggett and Irene Dunniger, or "Irene Brown," as she is sometimes called. Those houses were only a few feet apart. Irene Dunniger's house was located on the other side of the road, yet only a few feet away from Willie Mae's house. And Willie Mae was asked later, "Now, where are those houses? Where is this camp where you live? Mr. Canet's camp, did you say? * * * Where is that? What county is it in?" And her answer was, "In George County." She was then asked, "What state? Is it in Mississippi?" And her answer was "Yes, sir." It was also shown by Willie Mae's testimony and the testimony of the sheriff that the appellant was standing only a few feet from the corner of his house and only a few feet from the corner of Willie Mae's house, at the time he fired the fatal shot, and that Smokie was standing at the corner of Irene's house, only a few feet south of the road, when he fell. Even if the venue were in doubt, there is nothing

in the record to indicate it. We therefore hold that there is no merit in the contention that the State failed to prove the venue of the crime.

The next point argued by the appellant's attorneys is that the court erred in allowing the drawing or sketch of the camp settlement area made by the sheriff to be offered in evidence over the objection of the appellant's attorney. The appellant claims that the drawing was not an actual reproduction of the scene of the crime, but "an artistic reproduction of the scene of the crime, carefully planned by the State's witness." ██ But there was no error in the action of the trial judge in admitting the drawing as an exhibit to the sheriff's testimony. This Court has held that such drawings or sketches are admissible as an aid to a proper understanding of the testimony of the witness and as an aid to the witness in explaining the facts relative to points and objects. Jones v. State, 148 Miss. 531, 114 So. 343; Gulf Research Development Co. v. Linder, 177 Miss. 123, 170 So. 646.

The rule governing the admission of such drawings and sketches and the weight to be attached to such evidence is stated in Wharton's Criminal Evidence, Vol. 2, p. 1314, par. 772, as follows:

██ "A map, diagram or plat, if verified as a true and correct representation of the subject matter about which testimony is offered or is to be offered, and if reasonably necessary and material, is admissible in evidence as a proper instrumentality to assist the court and jury in understanding the testimony and the case at hand. * * * ██ If the accuracy of the illustration is disputed, it is a question for the jury, turning upon the credibility of the witness. ██ Where the exhibit does not purport to be exact, a map or rough sketch may be admissible, although not drawn to scale, or not correct in all particulars, if substantiated generally as to the subject matter to which it relates by the testimony of the witness using the exhibit. * * * ██ Such exhibits are generally

used to illustrate the locus in quo of a crime, and their admission, not as testimony, but as illustrative of testimony, rests in the discretion of the trial court.''

■■■ The third point argued by the appellant's attorneys is that the court erred in permitting the State, under the pretense of putting in evidence in rebuttal, to prove by the witness Tommy Lee Dunniger additional facts concerning the shooting which should have been proved as a part of the State's evidence in chief. But no objection to the testimony now complained of was interposed at the time the testimony was admitted, and no motion was made thereafter to exclude the testimony from the consideration of the jury; and it cannot be said that the trial judge erred in admitting testimony which was not objected to at the time it was admitted.

Furthermore, while it is true that a part of Tommy Lee's testimony was in fact substantive evidence in chief and should have been introduced as such before the State rested its case the first time, a careful reading of the record shows that most of his testimony was in a real sense rebuttal testimony.

Tommy Lee testified that Smokie was not engaged in a scuffle with Irene to get possession of a gun at the time that the appellant shot him, as testified by the appellant and his mother. Tommy Lee stated that he did not see Irene at all at that time. Tommy Lee testified that Marcus Baggett was not at Irene's house, but at his own house, when the shooting occurred. The most damaging part of Tommy Lee's testimony that was not strictly in rebuttal was the statement that he made about going over to M. C.'s house and trying to get M. C. not to shoot Smokie, and the statement that he made that he and John Willie Lee tried to hold M. C. so that he would not shoot Smokie. But Willie Mae had already testified during her examination in chief that, when she went to her door after the difficulty had begun, she saw Tommy Lee and John Willie Lee holding M. C.

In the case of Clark v. State, 181 Miss. 455, 462, 180 So. 602, the Court said: "It is not reversible error for the court to allow testimony in rebuttal which should have been introduced as substantive evidence in chief, unless it is shown that no opportunity is afforded the defendant to reply by surrebuttal testimony. Roney v. State, 167 Miss. 827, 150 So. 774, and other cases therein cited. In other words, the admission of such testimony rests largely within the sound discretion of the trial court." See also, Howze v. State (Miss.), 43 So. 2d 191.

It is next contended on behalf of the appellant that the court erred in permitting Tommy Lee and Willie Mae to testify that neither Tommy Lee nor Irene had been summoned as a witness to testify for the appellant; and that the appellant's brother-in-law, although present at the trial, had not been called to testify as a witness for the appellant. The appellant argues that proof of the above mentioned facts was obviously intended to influence the jury by making it appear that the reason that the witnesses were not called to testify for the appellant was that their testimony would be unfavorable to the appellant. But it does not appear that any objection was made to the above mentioned testimony when the testimony was given and the question as to its incompetency cannot be considered by us on this appeal. Perryman v. State (Miss.), 183 So. 498.

■■■ The next point argued by the appellant's attorneys is that the court erred in granting the State's instructions numbered 1 and 2. It is contended that the instructions are confusing and misleading. But we have examined both of these instructions, and we think that there is no error in either instruction that could have mislead the jury in any way, or that would justify a reversal of the judgment of the lower court. ■■■ The appellant criticizes the first instruction because of the use of the phrase, "at a time when the deceased was making no overt act

toward the defendant." The appellant says that it was admitted that the deceased was making no overt act toward the appellant at the time the appellant shot the deceased, but that according to the appellant's testimony the deceased, at the time that he was shot, was engaged in a tussle with Irene Brown to get possession of a gun for the purpose of shooting the appellant, and that the giving of the instruction was prejudicial to the appellant's claim of self defense. But the instruction was based upon the testimony of the State witnesses and embodied the State's theory of the case, and the State had a right to ask for an instruction of that kind. The appellant's theory of self defense was aptly presented in four well-drawn instructions which the court granted to him; and we think that the instructions as a whole constituted a fair statement of the law.

The criticism made of the State's instruction No. 2 is that the use of the words, "which gunshot wound was the producing cause of death," had the effect of taking from the jury the very question that they had been called upon to decide. But we think that the instruction, as given, clearly left to the jury the right to decide whether the gunshot wound which Smokie received was the producing cause of death; and that the criticism mentioned above is not a valid criticism.

 ██ Finally, it is argued that the verdict of the jury was against the overwhelming weight of the evidence. But we do not think that the verdict is against the overwhelming weight of the evidence. There was a sharp conflict in the testimony of the State's witnesses and the testimony of the appellant and his witnesses. The jury accepted the State's version of the facts relating to the homicide, and we think that there was ample evidence to support the jury's verdict. We find no reversible

596

error in the record, and the judgment of the lower court is therefore affirmed.

Affirmed.

*Roberds, P. J.,* and *Lee, Holmes* and *Ethridge, JJ.,* concur.