515 So.2d 952 (1987)
Ezell MURRIEL
v.
STATE of Mississippi.
No. 57684.
Supreme Court of Mississippi.
November 18, 1987.
*953 Abe A. Rotwein, Jackson, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Charles W. Maris, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and ANDERSON, JJ.
DAN M. LEE, Presiding Justice, for the Court:
This is an appeal from the Circuit Court of the First Judicial District of Hinds County wherein Ezell Murriel was convicted of raping his 11-year-old daughter and sentenced to life in prison. The case was advanced on this Court's docket on motion by the child's guardian ad litem. Murriel assigns ten errors, but we reverse and address only two issues which require discussion.
September 26, 1985, then 10-year-old J.M. was preparing to go to school. Her mother left earlier to take a relative somewhere, leaving J.M. and her father alone. Her father, Ezell Murriel, was sewing up a pair of pants for her to wear to school that day. He stopped, however, grabbed J.M. and laid her down on the couch. She stated Murriel pulled her panties to one side and then laid on top of her. He then put his penis inside her vagina and began moving back and forth. Afterward, she got up and went to the bathroom. Her mother returned and took her to school, though by this time she was late.
J.M. reported the alleged assault to her teacher and principal when she arrived at school that morning. The principal then called authorities. Shortly thereafter two welfare workers and a police detective arrived. After a short interview with J.M., they obtained a verbal court order to remove the child from school. After a medical examination, the child was taken to a shelter and eventually put in a foster home, where she remained at the time of trial.
Detective Vince Graef of the Jackson Police Department Juvenile Division accompanied the child to University of Mississippi Medical Center where a doctor examined J.M. and prepared a rape packet. Tests revealed semen in J.M.'s vagina, and the source was a person who was a secretor with type B blood. A secretor is someone whose blood type can be recognized in other bodily fluids. Murriel is a type B secretor. J.M. has type O blood and is a non-secretor.
J.M. testified that she had sex with another boy, her 13-year-old uncle, the night *954 before her father had sex with her. A blood test of the uncle, however, showed he had type O blood. Debra Butler, a police forensic serologist expert, testified that the uncle could not have been the source of the semen.
Murriel was arrested the following morning. At that time he gave a statement denying that he had sex with J.M. Murriel stated he did attempt to have sex with J.M. about a year before this, but his penis would not go in. He said he had been seeing a counselor off and on since then. When told there was semen found in J.M.'s vagina, Murriel said he was not the source and he did not know if she had been fooling around with anyone else. Murriel also stated that "anytime me and my wife make my daughter do something she doesn't want to, she accuses me of raping her."
Murriel testified in his defense and stated that he had been up all night looking for his daughter because neither he nor his wife were told authorities removed J.M. to a shelter. He stated that he had not been seeing the counselor for himself, but for his wife who had been having problems with stress; however, he did talk with psychologist William Osborn about J.M. making false accusations of sex abuse. These accusations began after one incident when he whipped J.M. for taking groceries from a neighbor. He denied ever touching her sexually, however, and denied he ever attempted any penetration.
William Osborn testified that he spoke with J.M. about previous suggestions of sex abuse but she never claimed Murriel did anything to her.
J.M. at one time recanted her story in an unsworn statement made during an interview conducted at the Welfare Department February 7, 1986. Her mother, defense counsel, and welfare workers were present. She testified at trial, however, that she made that statement because she wanted to go home, and her mother wanted her to say that daddy did not do it. She realized when she talked again with her counselor, Jennifer Skinner, three days after the interview that she had to tell the truth.

I.

Did the Trial Court Err in Failing to Grant a Mistrial Because of References to the Prosecutrix's Abortion?
Murriel points to several instances where the prosecution or the prosecution's witnesses referred to J.M. undergoing an abortion. We note at this juncture there was no evidence the pregnancy and resulting abortion resulted from sexual contact between Murriel and J.M. To the contrary, the child's own statements named a third person with whom she previously had sex as the putative father of the aborted fetus; thus, the jury heard several references to a totally unrelated and irrelevant pregnancy which, therefore, had no bearing on whether the defendant raped, or indeed had sex, with J.M. on September 26, 1985. The first instance was during voir dire when the prosecutor commented, "You'll also hear the testimony of another doctor who performed an abortion on that child."
During direct examination the prosecution elicited testimony from J.M. that she was diagnosed as being pregnant in October 1985. The prosecution then impliedly linked defendant with this pregnancy and then asked:
Q. Do you recall them doing anything to your body so they would get rid of the baby? Do you remember that?
A. No.
Q. You don't remember any of that at all. You just know that you went and then they told you you weren't going to have a baby anymore?
A. [Affirmative nod.]
Q. Okay. Is that yes or no?
A. Yes.
Defense counsel waited until J.M. answered one more unrelated question and then moved for a mistrial. The trial judge overruled this motion but offered to instruct the jury to disregard the statements. This offer was declined by defense counsel, who stated "the damage has already been done."
*955 Finally, on rebuttal the prosecution elicited testimony from Jennifer Skinner, a clinical social worker, that she was referred to J.M. to assess her emotional state "given the fact that she had recently had an abortion." Defense counsel moved again for a mistrial which was overruled, though the court cautioned the witness not to discuss the abortion.
Following the state's case in chief, Murriel again moved for a mistrial on the basis of the abortion statements. The trial court at this time stated, "you're at liberty to explore and go into any aspect of the abortion or any aspect of the circumstances surrounding it, and you're not precluded in any manner from developing that."
Murriel argues on appeal that Stokes v. State, 484 So.2d 1022 (Miss. 1986), requires reversal. In Stokes, the prosecution asked during voir dire whether prospective jurors would be biased knowing the 13-year-old prosecutrix had had an abortion. Defense counsel did not object to this voir dire, but the state subsequently made a motion in limine to prevent reference to the results of tests on the fetal remains. The trial court granted this motion, but subsequently denied defendant's motion for a mistrial based on the grounds that it was unduly prejudicial to allow the abortion to be raised and not allow defendant an opportunity to prove that defendant was not the cause of the pregnancy. 484 So.2d at 1024.
This Court stated: "The circuit judge should have sustained the motion for a mistrial under the posture of the case with which he was confronted." Id. at 1025.
Limited to this statement by the prosecution on voir dire, the jury could very well have concluded that not only did Stokes rape the child, he made her pregnant as well, either on April 13, 1982, or at some other time. Elementary to all trial proceedings is the proposition that the occurrence of any prejudicially incompetent matter or misconduct before a jury, the damaging effect of which cannot be removed by admonition or instructions, necessitates a mistrial. [citations omitted] Indeed, under some circumstances the circuit judge of his own motion is required to direct a mistrial.
Id. at 1025. The Court went on to state that "[t]he only way the information elicited by the state could have avoided prejudicing the defendant would have been a concession by the state that Stokes had nothing to do with making his step-daughter pregnant... ." The Court also stated that since the state introduced the subject of the child's abortion, "the state should not have been permitted to shut the door. In a trial, neither party should be permitted to limit the jury's view to a cheesecake picture." Id. at 1024.
The question presented is whether allowing Murriel to show he was not responsible for the pregnancy and resulting abortion is sufficient under Stokes. We hold that it is not, and we reverse.
Stokes dealt with irrelevant evidence of an abortion. Though pregnancy and possibly abortion may be relevant to show penetration, Howard v. State, 417 So.2d 932, 933 (Miss. 1982); see generally, Annot. 62 A.L.R.2d 1083 (1958 & Supp. 1987), it may not be relevant to show consent or identity. See Howard, 417 So.2d at 933 (identity). We think more than just minimal relevancy must be shown before evidence of pregnancy or abortion would be admissible. We need not address the point here, but admissibility may be subject to the fulfillment of a condition of fact or a balancing of prejudice and probativeness. This suggests the need for a preliminary determination of admissibility similar to that required under 412(c).
The trial court did not find evidence of an abortion admissible. As noted, the record does not support admissibility, and, in fact, it tends to establish that Murriel could not have been responsible for the child's pregnancy. Thus, this case is in the same posture as Stokes.
The state argues that Stokes only requires that the defendant be given an opportunity to rebut the implication that he made the child pregnant. Whatever the advisibility of such a rule where there is a preliminary showing of relevancy and admissibility, *956 we think it wholly insufficient in the present context.
Where the prosecutrix's pregnancy or abortion is totally unrelated to the defendant, the defendant is placed in the position of having to prove a negative, which in all likelihood he is totally unprepared and unable to do. The state would require defendants to disprove paternity without the faintest preliminary showing. In addition, the risk of confusing the jury is greatly increased by diverting its attention to a paternity suit unrelated to the rape trial. It is also not clear to what extent a defendant could present evidence, consistent with M.R.E. 412, of a prosecutrix's prior sexual contacts which could have caused the pregnancy. Combined with the highly prejudicial impact of implying defendant was responsible for impregnating a child of 11  his daughter at that  the foregoing requires us to reject the state's proposition.
The prosecution did not concede, or attempt to minimize the impact of the abortion statements by conceding, that Murriel was not responsible. Stokes suggests a concession on this point would alleviate the prejudice, though this was not done here. Even had a concession been forthcoming, we likely would find it to be an inappropriate remedy because it also diverts the jury's attention from the real issue. The further assumption that the prejudice may be removed by a concession we also think is dubious. The better policy is to prohibit reference to the subject in any manner.
We hold that under Stokes an unfounded implication that defendant impregnated his 11-year-old daughter required that the trial court grant Murriel's request for a mistrial. The failure to grant it in this case was reversible error.

II.

Did the Trial Court Err in Allowing the Prosecution to Use Dolls or Mannequins to Explain the Prosecutrix's Testimony?
During direct examination, the prosecution presented to J.M. two anatomically correct dolls which defense counsel described as "large." J.M. stated that the dolls would not help her explain the assault, but she could use the dolls to demonstrate what happened.
Over objection, J.M. was allowed to pull the female doll's panties to one side, unzip the male doll's pants, remove its penis and demonstrate intercourse.
Murriel suggests it was inflammatory to allow the prosecutrix to explain her testimony while demonstrating with large, anatomically correct dolls.
This is our first opportunity to address the admissibility of demonstrative evidence under our new Mississippi Rules of Evidence, effective January 1, 1986. Our pre-rules evidenciary precedent is not inconsistent with our approach under the rules, however.
In Gandy v. State, 373 So.2d 1042, 1047 (Miss. 1979), this Court stated that if "reasonably necessary and material," demonstrative evidence may be admitted in the trial court's sound discretion. See also, Mississippi Road Supply Co. v. Baker, 199 So.2d 820, 823 (Miss. 1967). The Court in Gandy cited Baggett v. State, 219 Miss. 583, 69 So.2d 389 (1954). It went on to state, "`[n]ecessary and material' as used in the Baggett case means appropriate and relevant." Gandy, 373 So.2d 1047.
Our rules seem to carry forward this standard. Rule 402 makes relevant evidence generally admissible, and Rule 401 defines relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence."
Rule 403, in this context, provides the bounds of "appropriateness" by allowing relevant evidence to be excluded
[I]f its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cummulative evidence.
Like other prejudice versus probative balancing problems, the determination of *957 whether to allow demonstrative evidence is left to the trial court's discretion.
The editors of McCormick state, "[s]ince the types of demonstrative evidence and the purposes for which it is sought to be introduced are extremely varied, it is generally viewed as appropriate to accord the trial judge broad discretion in ruling upon the admissibility of many types of demonstrative evidence." McCormick on Evidence § 212 at 665 (E. Cleary 3d ed. 1984).
Demonstrations using anatomically correct dolls in sex offense cases are generally relevant to corroborate that the child knows the body parts he or she is describing, and to assure that the jury understands exactly to what the child is referring. See e.g., State v. Watson, 484 So.2d 870 (La. Ct. App. 1986); Vera v. State, 709 S.W.2d 681 (Tex. Ct. App. 1986).
This does not necessarily mean that every demonstration is "appropriate" or that its probative value substantially outweighs its potential unfairness under Rule 403.
Generally, courts find demonstrations with anatomically correct dolls to be appropriate, though many have done so without analyzing whether in a particular case the demonstration was too prejudicial. See e.g., State v. Ball, 733 S.W.2d 499 (Mo. Ct. App. 1987) (13-year-old victim allowed to demonstrate sex act); Edwards v. State, 500 N.E.2d 1209 (Ind. 1986) (10-year-old girl allowed to demonstrate intercourse and fellatio); Commonwealth v. Reid, 400 Mass. 534, 511 N.E.2d 331 (1987) (five-year-old victim allowed to demonstrate sexual conduct), Cf., People v. Garvie, 148 Mich. App. 444, 384 N.W.2d 796, 799 (1986).
On remand, the trial court should apply M.R.E. 401 and 403, keeping in mind the suggestive nature of such a display, to determine the extent to which the prosecutrix might use anatomically correct dolls.
In summary, we hold the trial court committed reversible error by failing to grant defendant a mistrial because of an impermissible reference to the prosecutrix's unrelated abortion.
Having reviewed the record as submitted from the Circuit Court of Hinds County, and having found error therein, the judgment of conviction of rape and sentence of life in prison in the custody of the Mississippi Department of Corrections is hereby vacated and this case is reversed and remanded to the Circuit Court of the First Judicial District of Hinds County for retrial or such other disposition as may be proper.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.