758 So.2d 480 (2000)
Eric ROBINSON, Appellant,
v.
STATE of Mississippi, Appellee.
No. 1998-KA-01098-COA.
Court of Appeals of Mississippi.
April 11, 2000.
*482 Richard Flood, Ridgeland, Attorney for Appellant.
Office of the Attorney General by Dewitt T. Allred, III, Attorney for Appellee.
BEFORE McMILLIN, C.J., IRVING, AND THOMAS, JJ.
IRVING, J., for the Court:
¶ 1. Eric Robinson and Antoine "Scound" Robinson were jointly indicted in the Madison County Circuit Court for the murder of Leon Oscar, Jr. Eric Robinson was tried separately. The jury returned a guilty verdict, and it is from that guilty verdict and judgment of the trial court that Robinson prosecutes this appeal, assigning as error the following issues, taken verbatim from his brief
I. ERRED WHEN IT OVERRULED THE DEFENDANT'S OBJECTION TO THE USE OF A "DIAGRAM" PRODUCED AT THE START OF THE TRIAL.
II. ERRED WHEN IT OVERRULED THE DEFENDANT'S OBJECTION TO THE TESTIMONY OF TONY McGRUDER AS A REBUTTAL WITNESS.
III. ERRED WHEN IT DENIED THE DEFENDANT'S MOTION FOR A MISTRIAL WHEN THE STATE IN ITS USUAL BACKHAND MANNER SUGGESTED TO THE JURY DURING LaTASHA HOWARD'S TESTIMONY THAT DEFENDANT'S ATTORNEY HAD TAINTED HER TESTIMONY.
IV. ERRED WHEN IT DENIED THE DEFENDANT'S REQUEST THAT THE STATEMENT OF ANTOINE ROBINSON, A CO-DEFENDANT, BE ADMITTED INTO EVIDENCE.
V. ERRED WHEN IT DENIED THE DEFENDANT'S REQUEST THAT HIS ATTORNEY BE ALLOWED TO TESTIFY TO THE STATEMENTS MADE TO HIS ATTORNEY BY ANTOINE ROBINSON, A CO-DEFENDANT.
VI. THAT THE TRIAL COURT ERRED WHEN IT DENIED THE DEFENDANT'S MOTION TO WITHDRAW BECAUSE DEFENDANT'S ATTORNEY HAD BECOME A WITNESS IN THE CASE.
VII. THAT THE TRIAL COURT ERRED WHEN IT ADMITTED THE GUN INTO EVIDENCE OVER THE DEFENDANT'S OBJECTION.
VIII. THAT THE TRIAL COURT ERRED WHEN IT SUBMITTED JURY INSTRUCTION S1 OVER THE OBJECTION OF DEFENDANT BECAUSE THE INSTRUCTION DID NOT STATE THAT THE KILLING WAS "WITHOUT AUTHORITY OF LAW".
IX. THAT THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S REQUESTED JURY INSTRUCTION D14 (ACCIDENT)
X. THAT THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S REQUESTED JURY INSTRUCTION D15 (DEFENDANT HAD A RIGHT TO ARM HIMSELF).
XI. THAT THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S REQUESTED JURY INSTRUCTION D16 (DEFENDANT HAD A RIGHT TO STAND HIS GROUND).
XII. THAT THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S REQUESTED JURY INSTRUCTION D17(JUSTIFIABLE HOMICIDE).
XIII. THAT THE TRIAL COURT ERRED WHEN IT ALLOWED THE STATE TO ARGUE TO THE JURY THE EXIT/ENTRANCE WOUND *483 OVER THE OBJECTION OF THE DEFENDANT.
Finding no reversible error, we affirm.

FACTS
¶ 2. The facts according to the State's case are as follows:
¶ 3. On September 4, 1997, Will Carter was working at Spur Convenience Store in Canton when two of the store's customers, Antoine ("Scound") Robinson and Leon Oscar, Jr., became involved in a physical altercation at the checkout counter. Prior to the start of the fight, Carter had observed Oscar enter the store and take a six-pack of beer to the checkout counter. He next observed Scound enter the store behind Oscar and take a single can of beer to the checkout counter.
¶ 4. Contrary to the testimony of another witness, LaTasha Howard, Carter testified there was no one else in line at the checkout counter except Scound and Oscar. He did not hear these two individuals say anything to each other, but he did see Scound strike the side of Oscar's head with the can of beer. A scuffle ensued wherein the individuals knocked over a potato chip rack. It was at this point that Eric Robinson got out of the truck he was sitting in outside of the store and entered the store with a gun in his hand. Robinson rushed over to the struggling individuals, aimed and fired the weapon, striking Oscar in the right side of his neck.
¶ 5. After the shot was fired, Scound got up from where he had been taken down by Oscar as Oscar fell, and hurriedly left the store. Carter testified that Robinson struck Oscar twice with the gun and kicked him before Robinson also left the store. Carter testified that he heard Scound say to Robinson, "Come on, man, you done shot the guy."
¶ 6. On cross-examination, Carter was asked about an individual named Tony McGruder, also known as Pig. Carter stated that he did not know Pig. He testified that someone came into the store after Scound and Robinson left, who appeared to search the person of Oscar as he lay shot on the floor of the store. He testified that the individual said he was looking for keys to Oscar's car so that he could move it. Carter testified that he did not see the individual remove anything from Oscar's person.
¶ 7. Randell Coleman was also working at the Spur store on September 4, 1997. At the time of the altercation between Scound and Oscar, Coleman was working on the store's gas console, along with witness Carter, at a counter located near the store's entrance. He observed Oscar and Scound as they entered the store and picked out their purchases from the beer cooler, but did not witness the start of the altercation. Coleman was alerted to the scuffle by the person working the cash register who called his name. He looked up in time to hear the gunshot and see Oscar fall to the floor. He then dropped to the floor behind the counter himself. He peered over the counter and saw Robinson standing over Oscar with a gun in his right hand.
¶ 8. On cross-examination Coleman testified that an individual he knew as Pig entered the store with Oscar, but walked out after Oscar took the beer from the cooler. Pig reentered the store after Scound and Robinson left and was observed patting Oscar down and going through his pockets. Coleman testified that he first asked and then demanded that Pig stop searching Oscar and leave the store. Pig then left the store.
¶ 9. Dr. Steven Hayne performed an autopsy on Oscar. He concluded from his autopsy examination that Oscar died of a gunshot wound to the neck. There were gunshot wounds to the left and right side of the neck and to the left shoulder and arm, all of which could have been caused by a single gunshot. He was unable to reach a conclusion as to which wounds were entrance wounds and which were exit wounds because Oscar had survived for a period of approximately two weeks, and *484 there were healing artifact changes to the wounds. He was able to conclude, however, that the neck wounds were consistent with a right side entry and left side exit wound. He further testified that the neck wound was the lethal wound.
¶ 10. Robinson called LaTasha Howard to testify in his defense. She testified at trial that she had known Scound for three years. She claimed to have been in the checkout line talking with Scound at the time the scuffle began. It was her testimony that she saw Robinson "coming from like this side. And he rapped him (Oscar) on the right-hand corner of the ear, and the gun went off. And I immediately went out the store." She reentered the store after two to three minutes and saw Oscar lying on the floor bleeding while Pig was going through his pockets. She then left the store.
¶ 11. Robinson took the stand in his own defense and testified that on the day of the incident he was at his grandmother's house washing his girlfriend's car. He testified that when he came across her gun, he put it in his back pocket. Later, his cousin, Scound, came by and the two of them drove to the Spur store to get beer.
¶ 12. He testified that approximately three weeks earlier Oscar had fired gunshots at his grandmother's house. He stated that he and Scound entered the store together, and he waited at the beer cooler while Scound was in line waiting to pay for the beer. He said that Scound and LaTasha Howard were in line about three feet from Oscar. He claimed that there were five or six people in the line. He said that Scound grabbed Oscar when Oscar made some sort of move. He testified that as soon as he saw them "tussling," he immediately pulled the pistol out of his pocket because he was scared and didn't want either of them to get shot. He said he was afraid for his life and was afraid of Oscar because Oscar had fired shots at his grandmother's house. When asked when did he decide to fire the gun, he said, "I didn't. I didn't know I had fired." When asked how many shots he heard, he said, "I don't know.... I didn't know whether that was a shot or whether I hadwhether who had shot. I didn't know who had shot."
¶ 13. He claimed not to know that a shot had been fired until later that afternoon when someone called his aunt's house on the telephone. He said that he and Scound ran from the store because he did not know who had fired a shot, and that when they reached the truck, both he and Scound checked themselves to see if either of them had been shot. He claimed to have left the store ahead of Scound.
¶ 14. The State called Tony "Pig" McGruder in rebuttal. He testified that on the day of the incident, he rode to the store with Oscar to get beer. He went into the store with Oscar to purchase the beer but left after Oscar offered to pay for the beer. He met Scound coming in the door as he was leaving. A few minutes later, he heard someone yell that there was a fight going on in the store. He saw people leaving the store but he did not see Oscar leave so he went back into the store. Inside, he saw Oscar lying on the floor bleeding. He testified that he used the phone in the store to call Oscar's father and remained with Oscar until the paramedics arrived, shaking him and talking to him in an attempt to prevent him from losing consciousness. He testified that he left when told to do so by the police. He testified that he did not go into Oscar's pockets nor remove anything from Oscar's person.

ANALYSIS OF ISSUES PRESENTED

I. Use of the diagram.
¶ 15. Robinson complains that the State's use of an unauthenticated diagram during his trial constituted reversible error. At the start of the trial, during the testimony of witness Will Carter, the State asked Carter to step down and look at a diagram. Robinson's counsel objected that there was no authentication for the diagram, *485 and the person who drew it was not present. The State responded that the witness was being questioned about the layout of the store, and the diagram's use was simply demonstrative. The objection was overruled. Carter testified that the diagram was a true and accurate representation of the store layout on the day in question. He then gave testimony using the diagram to show the jury the layout of the store and marking on the diagram with a pen as he testified. The diagram was never marked for identification or offered as evidence.
¶ 16. The Mississippi Supreme Court in Baggett v. State, 219 Miss. 583, 591, 69 So.2d 389, 393 (1954) held that such drawings or sketches are admissible as an aid to a proper understanding of the testimony of the witness and as an aid to the witness in explaining the facts relative to points and objects. The rule governing the admission of such drawings and sketches and the weight to be attached to such evidence is stated in Wharton's Criminal Evidence, Vol. 2, p. 1314, par. 772, as follows:
A map, diagram or plat, if verified as a true and correct representation of the subject matter about which testimony is offered or is to be offered, and if reasonably necessary and material, is admissible in evidence as a proper instrumentality to assist the court and jury in understanding the testimony and the case at hand.... Where the exhibit does not purport to be exact, a map or rough sketch may be admissible, although not drawn to scale, or not correct in all particulars, if substantiated generally as to the subject matter to which it relates by the testimony of the witness using the exhibit.... Such exhibits are generally used to illustrate the locus in quo of a crime, and their admission, not as testimony, but as illustrative of testimony, rests in the discretion of the trial court."
¶ 17. We find that the diagram was allowed and used for the limited purpose of illustrating the layout of the store, and the trial court was well within its discretion in allowing its use. This issue has no merit.

II. Was it error to allow the testimony of Tony McGruder?
¶ 18. Robinson argues that the testimony of Tony McGruder was improperly allowed during rebuttal when it should have been allowed only during the State's case-in-chief. He alleges that Hosford v. State, 525 So.2d 789, 791 (Miss.1988) is controlling, wherein it was stated that, "[I]t is the general rule in this state, as elsewhere, that the party who has the burden of proof, and the duty to open the case, must in his opening, and before he rests in his proof, introduce all the substantive evidence upon which he relies to establish his demand, and the extent of that demand."
¶ 19. McGruder was not inside the store at the time of the shooting and was not an eyewitness to the shooting. He had no substantive testimony to give that would have been relevant to proving Robinson's guilt. The record indicates that Robinson's counsel introduced McGruder into the case during his cross-examination of State's witnesses Carter and Coleman with questions tending to insinuate that McGruder removed something incriminating from the person of Oscar as he lay bleeding on the floor of the store. The State was entitled to put McGruder on the stand to rebut the insinuation. This issue has no merit.

III. Denial of motion for mistrial.
¶ 20. The failure of the court to grant a motion for mistrial will not be overturned on appeal unless the trial court abused its discretion. Johnson v. State, 666 So.2d 784, 794 (Miss.1995).
¶ 21. Robinson contends that the State was suggesting that witness LaTasha Howard had been coached by Robinson's defense counsel in the following exchange:

*486 Q. Did you get a look at the gun that you claim Eric Robinson hit or rapped Leon Oscar with?
A. No, sir I didn'tI didn'tI didn't evenby me not knowing who he is, sir, I don't know if he was in the store or not because I don'tI didn't know who he was. So I can't say if he was in there or not. He might have been, but not to my knowledge because I'm not knowing who he is.
Q. Did you see someone hit Leon Oscar with a gun?
A. I seeyeah, I see somebody rap him, rap him on theon hison the lefton the right-hand. I'm not sure. I'm notI just know he rapped him.
Q. Ms. Howard, you don't really know what happened in that store that day, do you?
A. Well, the way he explain it to me from the right-hand, and the right-hand or left side
Q. The way Mr. Flood explained it to you?
A. Yeah, I'm kind of confused. But because see, I might say he hit him from the right-hand side, you see; and he probably say that's not right because he could have hit him from my right-hand side like this, you know.
Q. And what you know about what happened in the store that day has been explained to you by Mr. Flood, hasn't it?
A. No, I'm talking about rightright when he's talking to me now, he's trying to make me understand from the right or left side.
MR. FLOOD: May we approach the Bench?
THE COURT: Yes, sir.
MR. FLOOD: Judge, we're going to move for a mistrial based on the prosecutor's misconduct of accusing me of telling this witness what to say. It's customary, and he knows it, for people to talk to the witnesses before the trial. May be he doesn't, but to come in here and insinuate to this jury that I am coaching this witness.
THE COURT: I don't think that they have that opinion at this point, and you will certainly be allowed to ask questions on redirect to askyou can ask her.
MR. FLOOD: He's done it three times.
THE COURT: You told her to sayno, she said something about you explaining something to her. And his first comment was, when he explained it, that when you explained it here in the court-room is what I understood. I'm going to deny the motion for a mistrial.
¶ 22. Robinson contends that this was clearly an attempt by the State to create in the minds of the jury the impression that his attorney had "explained" to the witness what happened in the Spur Station. He alleges that the State stopped just short of accusing his attorney of subornation of perjury. This conduct, he claims, constituted reversible error.
¶ 23. It seems clear that the witness was confused. She also appeared to be attempting to structure her testimony to agree with suggestions that had been made by Robinson's counsel on direct examination. It does not appear to this Court that counsel for the State asked the question with any improper motive in mind, but rather that counsel had serious questions about the witness's credibility in light of her obvious confusion. In fact, the issue was raised by the witness's response to the prosecutor's question on cross-examination that the witness really did not know what happened that day. As noted, the witness's response was, "Well, the way he explained it to me...." With the witness testifying that someone had explained it to her, the prosecutor would have been derelict had he not explored the matter further. The prosecutor could have and perhaps should have simply asked the witness who had explained it to her, without suggesting the answer. But that is the nature of cross-examination. And while *487 we do not condone what could be viewed as the State's suggestion of Robinson's counsel's involvement in the witness's confusion, we find that, in the context in which it occurred, it was a far cry from the type of prosecutorial conduct that constitutes ground for a mistrial. The decision to deny Robinson's motion for a mistrial was not an abuse of discretion by the trial judge. This issue is without merit.

IV. Denial of admission of statement by co-defendant.
¶ 24. Robinson argues that when his co-defendant, Scound, invoked his right to remain silent after being called as a witness by Robinson, Scound became unavailable to testify under M.R.E. 804(a)(1). Robinson goes on to argue that when Scound became unavailable to testify, any statements that Scound made to the police became admissible under M.R.E. 804(b)(3). M.R.E. 804(b)(3), Statement Against Interest, allows, as an exception to the hearsay rule:
A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
¶ 25. The statement Robinson sought to have admitted is as follows: "Yesterday when he came up on me and went under his shirt, I grabbed him so he couldn't shoot and hurt me." This statement is clearly not a statement against interest, but is a claim of self-defense. Therefore, it was not admissible under M.R.E. 804(b)(3). This issue is without merit.

V. Should Robinson's trial attorney have been allowed to testify?
¶ 26. Robinson alleges that statements made by Scound to Robinson's counsel were admissible under M.R.E. 804(b)(5). He argues that the trial court committed reversible error in denying his request to allow his counsel to withdraw as counsel so that he could testify for Robinson. In a proffer at trial, Robinson's counsel stated that he would testify that Scound made the same statement to him that he made to the police, and additionally, Scound stated that he was scared to death when Oscar came at him; that he did not know Robinson had a weapon on him; that he did not see the weapon at any time; that they did not plan to shoot anybody that day; that when they jumped into the car, they were both concerned about whether each other had been shot; that they went to Robinson's grandmother's house where Robinson got out of the car and left; that he has known Robinson all of his life and has never known Robinson to be a violent person; that Robinson's reputation in the community is for peaceful versus violent; and that at the time he grabbed Oscar, he thought Oscar had a gun or a knife in his pants.
¶ 27. Mississippi Rules of Evidence 804(b)(5), Other Exceptions, states, in pertinent part, that:
A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.
¶ 28. Even though Robinson claims that his counsel should have been allowed to testify under 804(b)(5), his argument in *488 support of this claim is based purely on an 804(b)(3) exception. We cannot find any evidence in the record to support Robinson's claim to an exception under M.R.E. 804(b)(5), and since we have already determined that the statement was not admissible as an exception under 804(b)(3), this issue has no merit.

VI. Counsel's motion to withdraw as counsel.
¶ 29. Since we can find no basis for allowing Robinson's counsel's testimony, there was no basis for allowing said counsel to withdraw. This issue is without merit.

VII. Admission of the gun into evidence.
¶ 30. Robinson contends that the State was allowed over his objection to introduce the gun into evidence without proper identification or establishment of the chain of custody. The record shows that the State was allowed to introduce the gun during the cross-examination of Robinson who testified that he was familiar with the gun, having seen it in his girlfriend's possession, and having fired it previously. He further testified that the gun shown to him at trial appeared to be the very same gun that he removed from his girlfriend's car and which he had in his hand when he approached Oscar and Scound in the Spurstore. Robinson had also testified on direct examination that he had gone to his grandmother's house with Vickie McNeil of the Canton Police Department the day following the shooting to retrieve the gun.
¶ 31. The standard of review of a trial court's admission or exclusion of evidence is the abuse of discretion standard. Thompson Mach. Commerce Corp. v. Wallace, 687 So.2d 149, 152 (Miss.1997). Under the circumstances of the case sub judice, we find that the trial court was well within its discretion in allowing the admission of the gun into evidence. The failure of the prosecution to establish all of the links in the chain of custody implicates the weight to be accorded the evidence by the jury, not its admissibility. Fisher v. State, 481 So.2d 203, 225 (Miss.1985). This issue lacks merit.

VIII. The giving of jury instruction S-1.
¶ 32. Instruction S-1 reads as follows:
The Defendant, Eric Robinson, has been charged by indictment in this case with the crime of murder. If you find from the evidence in this case, beyond a reasonable doubt that the Defendant, Eric Robinson, did on or about the 4th day of September, 1997, feloniously, willfully and unlawfully in Madison County, Mississippi,
1. with deliberate design to effect the death of another person,
2. kill Leon Oscar, Jr., a human being,
3. by shooting Leon Oscar, Jr. then you shall find the defendant, Eric Robinson, guilty of murder.
If the State has failed to prove any one or more of the above listed elements, beyond a reasonable doubt, then you shall find the Defendant not guilty.
¶ 33. At the trial, Robinson contended that the instruction did not instruct the jury that the killing must have been done "without authority of law." The State argued that "unlawfully" was synonymous with "without authority of law." "[S]ynonymous phrases or interchangeable words may be used in a jury instruction and the jury still be properly instructed." Lancaster v. State, 472 So.2d 363, 367 (Miss.1985) (citing Erving v. State, 427 So.2d 701, 703-05 (Miss.1983)). Since the word "unlawfully" and the phrase "without authority of law" are synonymous, no error occurred in substituting "unlawfully" for "without authority of law" in the jury instruction. Lester v. State, 692 So.2d 755, 790 (Miss.1997). This assignment of error is without merit.

*489 IX. Robinson's requested jury instruction D-14.

¶ 34. Instruction D-14 reads as follows:
The Court instructs the jury that should the jury find that Eric Robinson's act of drawing the gun and then attempting to separate Antoine Robinson and Leon
Oscar during the fight and that the weapon accidentally discharged causing injury to or the death of Leon Oscar then the jury shall find Eric Robinson not guilty.
¶ 35. At trial Robinson argued that Miss. Code Ann. § 97-3-15(1)(f) and § 97-3-17 (Rev.1994) provided the basis for the granting of instruction D-14. Section 97-3-15(1)(f) provides as follows:
Homicide; justifiable homicide.
(1) The killing of a human being by the act, procurement, or omission of another shall be justifiable in the following cases:
(f) When committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished;
Section 97-3-17 provides as follows:
§ 97-3-17. Excusable homicide
The killing of any human being by the act, procurement, or omission of another shall be excusable:
(a) When committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent;
(b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation;
(c) When committed upon any sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner.
¶ 36. The instruction was refused without comment by the trial court. Robinson contends his own trial testimony provided the basis for the instruction and that the trial court's refusal to grant the instruction ran afoul of Manuel v. State, 667 So.2d 590, 593 (Miss.1995) which held:
In homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely, and the trial court's failure to do so is error requiring reversal of a judgment of conviction. Hester, 602 So.2d at 872. Where the instructions are in improper form and are the only ones embodying a legally correct theory of the defendant's defense, it is the duty of the trial court to see that the instructions are placed in proper form for submission to the jury.
¶ 37. In the case at bar, no evidence was adduced which would justify giving the instruction. No one, not even Robinson, testified that Robinson drew the gun in an attempt to separate Scound and Oscar. One of the two eyewitnesses to the shooting, Carter, testified that Robinson walked directly to the struggling individuals, aimed, and discharged the weapon at Oscar. The other eyewitness, whose presence at the shooting was disputed by Carter and two other witnesses, testified that Robinson walked up to the struggling individuals and rapped Oscar on the ear with the weapon which then discharged. Even Robinson himself offered no testimony that he was attempting to break up a fight, or that the weapon accidentally discharged. On the witness stand Robinson repeatedly denied that the weapon was fired, either accidentally or otherwise. There was simply no evidence to support granting this instruction. This issue has no merit.

*490 X. Robinson's requested jury instruction D-15.

¶ 38. Instruction D-15 reads as follows:
The court instructs the Jury that the jury should not view as evidence against ERIC ROBINSON that ERIC ROBINSON carried a concealed weapon on his person because under the law ERIC ROBINSON did have a right to carry a concealed weapon on his person if ERIC ROBINSON had been threatened and had good reason to fear a serious attack from an enemy and did in fact fear an attack.
¶ 39. We find that it was not error for the trial court to deny this jury instruction for the same reasons set forth in issue IX. There was no evidence in the record to support granting this instruction. Robinson testified that he put the gun in his pocket when he came across it while washing his girlfriend's car. All of the other witnesses testified that when they saw the gun it was in Robinson's hand. There was no testimony about Robinson carrying a concealed weapon because his life had been threatened by Oscar or anyone else. This issue lacks merit.

XI. Robinson's requested jury instruction D-16.
¶ 40. Instruction D-16 reads as follows:
The Court instructs the Jury that the danger which will justify the taking of another's life must be imminent, impending and present, such danger need not be unavoidable except by killing in self defense. ERIC ROBINSON need not have avoided the danger to his person presented by LEON OSCAR by flight. So long as ERIC ROBINSON was in a place where he had a right to be and was neither the immediate provoker or aggressor, ERIC ROBINSON may stand his ground without losing the right of self defense.
¶ 41. There was no evidence in the record to support granting this jury instruction. All of the evidence was that Oscar and Scound, not Robinson, were involved in a physical struggle with each other at the time that Robinson shot Oscar without provocation. This issue has no merit.

XII. Robinson's requested jury instruction D-17.
¶ 42. Instruction D-17 reads as follows:
The Court instructs the jury that the killing of any human being by the act, procurement, or omission of another shall be excusable when committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation.
¶ 43. There was no evidence in the record to support granting this jury instruction. The issue has no merit.

XIII. Statements by the State during closing argument regarding entrance/exit wounds.
¶ 44. During closing argument the State argued that the pathologist had classified Oscar's wounds as "entrance wounds" and "exit wounds." Robinson objected. The objection was sustained, and the jury was instructed to disregard the statement. The State was allowed to argue to the jury that the wounds were "consistent with entrance wounds and exit wounds." No objection was raised at the trial to the State's use of the term "consistent with entrance and exit wounds." Robinson raises this issue for the first time on this appeal.
¶ 45. The law is well settled in Mississippi that appellate courts will not put trial courts in error for issues not first presented to the trial court for resolution, and that issues not presented in the trial court cannot be first argued on appeal. Chassaniol v. Bank of Kilmichael, 626 So.2d 127, 133-34 (Miss.1993). See also Seaney v. Seaney, 218 So.2d 5 (Miss.1969), A.H. George And Co. v. Louisville & N.R. *491 Co., 88 Miss. 306, 40 So. 486 (1906). Procedural bar, notwithstanding, we find that when the court sustained Robinson's objection and admonished the jury to disregard the statements, any possible prejudice from the prosecutor's remark was effectively cured thereby. Foster v. State, 639 So.2d 1263, 1282 (Miss.1994). This assignment is rejected as being both procedurally barred and without merit.
¶ 46. THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY OF CONVICTION OF THE CRIME OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MADISON COUNTY.
McMILLIN, C.J., KING AND SOUTHWICK, P.JJ., BRIDGES, LEE, MOORE, PAYNE, AND THOMAS, JJ., CONCUR.