605 So.2d 240 (1992)
Paula Suzette SEAL
v.
Jeffrey MILLER.
No. 89-CA-0637.
Supreme Court of Mississippi.
July 22, 1992.
*241 Harry R. Allen, Mark W. Garriga, Allen Cobb & Hood, Gulfport, for appellant.
Colette A. Oldmixon, David R. Smith, Smith Smith Tate & Cruthird, Poplarville, Thomas D. McNeese, Aultman Tyner McNeese & Ruffin, Columbia, for appellee.
Before HAWKINS, P.J., and BANKS and PITTMAN, JJ.
BANKS, Justice, for the Court:

I.
This case comes to us on appeal from the Circuit Court of Pearl River County, where on October 29, 1987, Jeffrey Miller filed a complaint for damages against Paula Seal alleging inter alia that Seal negligently drove his car on January 8, 1987, causing a one-car accident which left him severely injured. Seal, conversely, alleged by counterclaim that Miller was driving the car the day of the accident and that she was also injured. Prior to the jury trial on October 12, 1988, Miller and Seal stipulated to the amount of damages each suffered.
Because the accident left both parties partial amnesiacs, the sole issue before the circuit court was the identity of the driver. The jury returned a verdict in favor of Miller, and Seal appeals, assigning as error, the allowance of an investigating officer and ambulance attendant to express opinions, without being qualified as experts, the limiting of the scope of the testimony of one of Seal's expert witnesses, and permitting inspection of an automobile not involved in the accident for demonstrative purposes.

II.
Seal and Miller were childhood friends, who had not seen each other for about six or seven years prior to January 1987. On January 7, 1987, they renewed their friendship by engaging in an evening of horseback riding, followed by dinner and dancing with friends. Before leaving the restaurant in Louisiana, they made plans with Miller's brother, Wade and a friend, Mike Temples, to meet at the home of Ruth Fleming, Miller's mother.
En route to Ruth Fleming's house, Mike and Wade Miller rode in a truck, while Miller and Seal traveled together in Ruth's Nissan 280-ZX. The parties stopped somewhere after they crossed the Louisiana/Mississippi line to give Wade a cigarette light. Mike and Wade testified that Miller was driving the car at this time. A few miles down the highway, the two vehicles stopped again and pulled into the parking lot of Dixie Lighting. Miller was still in the driver's seat.
Afterwards, Wade and Mike pulled back onto Highway 26 headed towards Picayune, Mississippi. Wade testified that about one-half mile down the road, he saw the 280-ZX pull onto the highway from Dixie Lighting. As he approached the crossroads, the sports car came "flying around my left side and made a turn fast ..." to the right and *242 onto Highway 43. Wade could not see the driver, but stated that the car was going faster than what he had earlier observed. Both Mike and Wade testified that they reached Ms. Fleming's home around 12:30 a.m. and were surprised that Miller and Seal had not arrived, since the couple had driven past them.
Seal testified that the last thing she remembered, after stopping the second time, was sitting in the passenger's seat as they drove past a convenience store about one and one-quarter mile from the accident scene. The car then left the road and struck a utility pole. Neither party remembered the impact.
At trial, the parties offered conflicting expert testimony from Dr. William Bushkirk, a bio-mechanical engineer, and Dr. Roy Arnold, a physicist, to aid in determining who was the driver, based on the physical evidence and the reported body positions of the two when discovered.
Sgt. Varnado was the investigating officer on the night of the accident. At the time of the accident, she had been employed by the Picayune Police Department for six and a half years. Prior to her employment, Sgt. Varnado had been trained in accident investigations. She investigated several hundred motor vehicle accidents in the course of her employment, including one-car accidents. Her training required that she focus on "[t]he tracks of the vehicle, the debris, what object it struck, and the location of people in the automobile after the accident."

III.
Seal asserts that the lower court erred in allowing Sgt. Varnado to render expert opinion testimony, without being qualified as an expert. She submits that Varnado attempted to "venture into the scientific fields of accident reconstruction and physics" with the following testimony:
Q. Based on your investigation, what evidence, if any, did you find that the vehicle had spun or done a 360 degree turn either before hitting the pole or after hitting the pole?
A. None.
Seal also raises the following:
Q. Based on your observations and what you observed and your experience as a law enforcement official, who has got six and a half years of investigating automobile accidents, who did you determine was driving the vehicle at the time of the impact?
A. Miss Seal.
Q. Have you ever seen any studies about what happens to individuals without seat belts on impact?
A. Yes, sir.
Q. Have you noticed that in those studies  you've probably seen some videos put out by the National Institute of Highway Safety Administration.
A. Yes, sir.
Q. Those impact studies  do you recall that when there is an impact without seat belts, the head usually goes forward first and rises?
MS. OLDMIXON: Your Honor, we object. I think he said the time of impact  how the impact is being accomplished. Object to form of the question.
THE COURT: Well I'm going to sustain the objection to her testifying to what she might have read in a book. She can testify of her experience, and, of course, ya'll have objected to her being an expert in some of these fields.
MR. ALLEN: I was overruled in my objection.
THE COURT: On her personal observations and so forth. Now if you want to go into this, if she's experimented or done personal observation, of course, I'll allow you the same latitude as Ms. Oldmixon.
Seal also asserts that the trial court erred by allowing Billy Graham, an ambulance attendant, to render "expert" opinion testimony regarding whether he observed evidence that the car had flipped or rolled over. Graham, a registered nurse and paramedic, with eight years experience in emergency medical services works on injured victims at the scene of motor vehicle accidents.
*243 Graham's duties entail discerning whether there was an accident, whether the vehicle involved was moving at a rapid or slow pace, observing physical conditions of the victims, taking into account the positions of the victims in the vehicle, the interior items in the vehicle, mechanisms of the accident, and the location of damage to the vehicle.
Seal objected to the following testimony by Graham:
Q. All right, now what evidence, when you were reviewing the physical damage to the vehicle and the scene of the accident, did you find of the car having rolled or flipped?
A. None.
MR. ALLEN: Objection ... Your Honor. There's no predicate layed [sic] that this man has any special expertise to make that kind of conclusion.
THE COURT: I'm going to overrule the objection on his personal observation. That's what he's testifying from  just his personal observation.
Miller, conversely, argues that both witnesses testified to their personal observations at the accident scene. He contends, moreover, that neither witness was directed to reconstruct the accident nor render an opinion about how the impact of the car caused the bodies to move within the vehicle. Thus, the testimony amounted to opinion testimony by lay witnesses governed by Miss.Rules of Evidence, Rule 701.

IV.
The admission of expert testimony is addressed to the sound discretion of the trial judge. Unless we conclude that the decision was arbitrary and clearly erroneous, amounting to an abuse of discretion, that decision will stand. Hooten v. State, 492 So.2d 948, 950-51 (Miss. 1986) citing Weiss v. Louisville, N.O. & T. Ry. Co., 7 So. 390 (1890).
We are not here presented with a Rule 702 issue. It provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
We are not faced with the question of whether Sgt. Varnado and Billy Graham were qualified as experts to render the testimony given because neither witness was tendered as an expert. Roberson v. State, 569 So.2d 691, 694 (Miss. 1990). Our analysis may be different had the two been tendered as experts and a subsequent query arose regarding their qualifications to render such testimony. Compare Miller v. Stiglet, 523 So.2d 55 (Miss. 1988). Thus, we now turn to a discussion of whether the testimony of the two witnesses was admissible under Rule 701, lay witness opinion.
Rule 701 of the Mississippi Rules of Evidence together with its comment in part states:
If the witness is not testifying as an expert, his testimony is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue.
* * * * * *
Comment
The traditional rule regarding lay opinions has been, with some exceptions, to exclude them from evidence. Rule 701 is a departure from the traditional rule. It favors the admission of lay opinions when two considerations are met. The first consideration is the familiar requirement of first-hand knowledge or observation. The second consideration is that the witness' opinion must be helpful in resolving the issues. Rule 701, thus, provides flexibility when a witness has difficulty in expressing himself in language which does not reflect an opinion. Rule 701 is based on the recognition that there is often too thin a line between fact and opinion to determine which is which.
*244 The testimony in question must be measured against the two-prong test embodied in the rule.
The first prong requires that the lay opinion be rationally based on first-hand knowledge or observation. "This language is directed at a witness, who was actually at the scene of the crime or accident." Roberson, 569 So.2d at 694. Neither Sgt. Varnado nor Billy Graham were at the scene the moment the accident took place. However, both arrived shortly thereafter and testified to what they perceived. Thus, they were at the scene of the accident for purposes of the rule.
Based on her view of the accident scene, Sgt. Varando testified that she did not perceive any evidence which indicated that the car had spun in a circular motion before hitting the pole. This type of testimony does not require any special expertise or skill. Instead, it is enough that a witness testifying, have first hand knowledge of what was present at the scene. Her testimony to the effect that there was an absence of evidence of a spin or rollover is rationally based on her observations at the scene. Indeed, the record does not reflect that the defendant objected to her testimony concerning the physical evidence of a rollover and the only objection to the absence of evidence of a 360 degree spin was to the effect that no such spin was claimed.
The second objectionable testimony of Sgt. Varnado is a different animal.
Q. Based on your observations and what you observed and your experience as a law enforcement official, who has got six and a half years of investigating automobile accidents, who did you determine was driving the vehicle at the time of the impact?
A. Miss Seal.
The question clearly calls upon Sgt. Varnado to render an opinion based on special training and experience. By definition, this is not a lay opinion. What Varnado actually said, however, was that she concluded that Seal was the driver because most of Seal was in the driver's seat, and Seal was pinned on the driver's side. She saw no evidence that the leg was pinned in any manner other than at impact. These are observations that she could have made without an opinion. Moreover, the conclusion that she reached was one that could have been reached by the jury based on these observations without expert guidance. It follows that the trial court erred in allowing this testimony because the opinion solicited was to be based on Rule 702 qualifications and because the opinion rendered and explanation thereof demonstrated that it was not helpful to the trier of fact.
We find the error harmless, however. The physical evidence pointing to Varnado's and, implicitly, the jury's conclusion, and the lack of physical evidence to the contrary clearly overwhelm any bias occasioned by the erroneous admission of Varnado's opinion. See, Wells v. State, 604 So.2d 271, (1992).
We also find that Graham's testimony passes muster on the first prong. His testimony was simply that based on his first-hand knowledge or observation at the accident scene, there was no evidence that the car overturned or struck anything which could have possibly caused it to flip or roll over. This is hardly the type of testimony which an expert would require skill to render. In fact, it is the kind of shorthand description capturing the essence of his testimony concerning relevant observations that is permitted by Rule 701.
The second prong of Rule 701, whether the witnesses' opinions are helpful in resolving the issue, must be analyzed by the following question, "Does the testimony tell the jury something it does not already know?" Roberson, 569 So.2d at 695. Except as noted above, we answer the question in the affirmative.
The question whether there was evidence at the scene suggesting that the automobile had spun or rolled was helpful to the jury in assessing the likelihood that the driver and passenger somehow changed places during the crash. Certainly, it may have been more appropriate for these witnesses to have testified that they observed *245 no scratches or indentations on the roof or sides of the car and no circular skid marks or other markings on the ground suggesting a spin or rollover. The shorthand version, however, is permissible under our rules, leaving it to the cross-examiner to flesh out or destroy the observation.
Finally, Seal's complaint concerning limiting the scope of her cross-examination of Varnado concerning her qualifications is without merit. She was not prevented from testing Varnado's qualifications, but rather from eliciting testimony from Varnado concerning what she saw on film. The point of this effort appears to be to have Varnado testify that impact would cause the passenger's upper body to move forward. That testimony was elicited from Varnado in later questions without reference to what Varnado may or may not have observed in videos.

V.
Seal argues that the trial court abused its discretion by excluding and limiting testimony of her expert witness, Woody Barber. She submits that despite Mr. Barber's qualifications and extensive questioning from both counselors regarding his ability to render expert testimony in the field of accident reconstruction, the Court voir dired Barber on matters that were unrelated to his training or qualifications in that field, instead, questioning him on his hands-on experience and eventually ruling that Barber could not testify to that regard. The circuit court ruled that Barber was limited to testifying about what happened to the vehicle. He was prohibited from testifying about the movements of persons inside the car. This evidence was proffered by Seal's counsel outside the presence of the jury.
Seal maintains that the trial court arbitrarily allowed Sgt. Varnado to testify to the identity of the driver and other pertinent facts while limiting Barber's testimony on this fact after he had been properly tendered as an expert and voir dired by both parties, as well as the court. In her opinion, this was clearly erroneous in light of Barber's qualifications. Seal argues that the trial judge's interpretation of Rule 702 was clearly incorrect in that he continued to voir dire Barber on hands-on experience despite his formal training in the field of accident reconstruction.
Moreover, Seal argues that the exclusion of testimony was an abuse of discretion in light of the fact that it was Barber who found a key piece of evidence in the vehicle, i.e. several strands of blond hair matching that of Seal, near a windshield post where the sun visor attaches. It is, furthermore, her contention that had Barber been allowed to testify, he would have explained how the hair ended up where it did.
Miller counters that Seal's rendition of this issue is misleading since the trial court found Barber qualified to testify as an accident reconstruction expert and vehicular damage analyst, and thus allowed him to testify freely in this area. Furthermore, Barber's testimony was only limited in those areas which, by his own admission, he had no expertise or training. Additionally, Miller asserts that Barber's testimony would have been cumulative to that of Seal's second expert, Dr. Roy Arnold. Dr. Arnold, an expert tendered in the field of physics and motor vehicular accident reconstruction, testified that he investigated the vehicle in question and found that it was possible that the drivers could have reversed their roles during collision.
It was established that Barber is a body shop repairman by training and experience. He has attended various schools or training sessions in that area sponsored by automobile franchise dealers. He contended that some of this training involved accident reconstruction. He has not received a certificate or diploma from any such school. Pertinent portion of Barber's voir dire is as follows:
MR. MCNEESE (counsel for Miller):
Q. Mr. Barber, how many times have you testified in a court of law with regard to the impact of the human body as an occupant of a vehicle?
A. In testifying, injuries does [sic] come in, but that is not what I specialize in. I *246 am called on to do damage analysis and reconstruction.
Q. Do you understanding my question, Mr. Barber? Have you ever in your life testified about what happens to the human body within a vehicle after that vehicle impacts or collides with another 
A. Yes, sir, I have testified about the passenger in the car.
Q. All right, tell me your background, training, or experience you have first of all in physics.
A. I don't have any background in physics.
Q. How about engineering?
A. I don't have any background in engineering.
Q. How about biomechanics?
A. Not biomechanics.
* * * * * *
MR. MCNEESE:
Q. Have you any training, background, or experience in applying the law of physics or mechanics to the impact upon the human body within an automobile? I may have asked you that.
A. You did, but I haven't had any training or any courses in physics.
There followed an extensive voir dire by the court in which the court sought to elicit from Barber the basis in his training and experience that qualified him to render an opinion concerning the movement of humans on impact:
THE COURT: All right, did you testify as to a  as Mr. McNeese has asked you, and has your experience or where have you had any training or experience through experimentation or whatever of impacts and passengers, drivers, and so forth in the vehicle, and the movement that all these objects take inside the vehicle, or have you had any experience in that regard?
WITNESS: Yes, sir, I have been on cases where that was involved.
THE COURT: I'm not asking you that. I'm asking you where did you get the training to go on that case where that was involved so you could make the determination of what happened?
WITNESS: Through the dealership and the Department of Transportation and other equipment manufacturers, we were shown films where there was  the result of impact especially when the design of car was changed. And watching those films, they actually used mannequins and things like that.
* * * * * *
Seal asserts that the judge continuously insisted that Barber have actually conducted the experiments himself:
THE COURT: Then what training do you have? I just want to find out. The experts here just to aid the jury, and if he can aid the jury, I'm going to let him aid them, but 
WITNESS: The cases I've been in that was involved with the passengers.
THE COURT: All right, but who else was involved in that case with you?
WITNESS: The attorneys.
THE COURT: No, sir, where you the one that told them what happened to those people?
WITNESS: In some cases I was the only one.
THE COURT: And what I'm asking you is  and I'm not trying to confuse you. What training, education, schooling, experience did you draw on to be able to tell them the answer to that question?
WITNESS: All I can identify, of course, is with the experience I've had in court.
THE COURT: That's just what I'm asking. Let's just don't sit here and give us rhetoric. I want to know what experience, where, when. Did you test a mannequin that hit a pole at 25 m.p.h.?
WITNESS: No, sir.
* * * * * *
WITNESS: But the cases I have been to Court on, I was called on to explain the impact and also the effects of the impact on the passenger and also reviewing pictures of injuries of the individual and made comments and references to my opinion of what motion or what even part of the car caused that injury.
THE COURT: All right, the only thing I'm asking you now is I want you to go *247 one step further. Where did you learn how to make that conclusion because if you went out to the accident itself, we don't know whether you made the right decision or not. You might be drawing on the wrong decision. What I want to know is what school or training or what that we know is in an environment that taught you correctly did you go to learn how to do that?
WITNESS: I think that with reviewing and viewing in groups that were especially testing the new designs of car like the absorbers and things like that and saw what happened in impact and reviewing and the commentaries they were made on and the reading materials, I think that's where it give me  and I already had hands on experience with the car  I think that give me an understanding of what happens with certain forces. I understand certain energies and certain things about physics except unless you're trained in the terminology, you don't ever put that in practice. You put it in practice from the experience from what you have done. And that's where I have applied it from that experience.
Based on the inquiries, the trial court allowed Barber to testify with respect to what happens to vehicles, when vehicles strike objects, damage to vehicles, and those other things relating to the vehicle. The Court, however, did not allow Barber to render testimony regarding what happened to Seal or Miller because of the impact.
As an initial matter, Miss.R.Evid. 614(b) allows the court to interrogate witnesses. The trial court abuses that authority when he gives up his role as judge and assumes that of advocate. Comment, Miss.R.Evid. 614; see also Jones v. State, 223 Miss. 812, 79 So.2d 273 (1955), appeal dismissed, cert. denied, 350 U.S. 869 [76 S.Ct 116, 100 L.Ed. 770] (1955), rehearing denied, 350 U.S. 919 [76 S.Ct. 192, 100 L.Ed 805] (1955); Rule 5.08 Uniform Criminal Rules of Circuit Court Practice. Clearly, the latter is not present here.
As previously stated, the trial judge is called upon to exercise his sound discretion in determining whether the witness is legitimately qualified as an expert in the applicable fields of scientific knowledge. Hollingworth v. Bovaird Supply Co., 465 So.2d 311, 315 (Miss. 1985); Pharr v. Anderson, 436 So.2d 1357, 1359 (Miss. 1983). An expert witness must possess that skill, knowledge or experience in the field in which he purports to render expert testimony to make it appear that his opinion or inference will probably aid the trier in his search for truth. McCormick, Law of Evidence, 30 (2d ed. 1972). However, "[i]t is not necessary that one offering to testify as an expert be infallible or possess the highest degree of skill; it is sufficient if that person possess peculiar knowledge or information regarding the relevant subject matter which is not likely to be possessed by laymen." Henry v. State, 484 So.2d 1012, 1015 (Miss. 1986), citing Glen Falls Ins. Co. v. Linwood Elevator, 241 Miss. 400, 130 So.2d 262 (1961) (other citations omitted.)
We find no abuse of discretion by the trial judge in questioning or limiting Barber's testimony. In the instant case, Barber was allowed to testify to that information which the trial judge in his discretion found Barber to be capable of rendering. The lengthy voir dire which the trial court conducted was an attempt to ascertain the extent of Barber's skill, knowledge, expertise on the relevant subject matter. Because Barber admittedly did not have any background in physics or biomechanics, and that the movement of people was not his field of "specialty" the court did not abuse its discretion in limiting Barber's testimony.

VI.
During the trial, the circuit court granted Miller's request that the jury be allowed to view an undamaged 280 ZX automobile for the limited purpose of demonstrating to the jury the `three dimensional concept of `space/volume'[1] within the interior *248 of the vehicle. The three-dimensional space/volume concept cannot be accurately shown through photographs, diagrams or measurements. Both parties stipulated that the undamaged vehicle was identical in layout as the vehicle involved in the accident with the exception of a T-top roof on the modeled car. Seal conceded that the T-tops made no difference with respect to the dimension of the car:
THE COURT: ... I have been apprised by both sides that if the Datsun people were to come here and testify, they would testify that the dimensions and so forth of the two vehicles are identical and that the T-tops make no difference on the inside room and the characteristics of the inside of the automobile. It is strictly a roof alteration and nothing more.
Notwithstanding Seal's earlier concession, she later objected to the view by the jury on the ground that cars with T-tops have open roof areas which are covered with transparent inserts as opposed to metal roofs. The lower court ordered the T-top inserts placed in the top of the car, giving the car the appearance of a hard top. On appeal Seal contends that the automobile should not have been shown in light of the fact that at least twenty photos of the model automobile had already been admitted into evidence.
Seal additionally objected to a view of the car on the basis that the jurors would be looking at the substituted car with the seats fixed in a particular position, and that this may or may not have been how the seats were fixed in Miller's car at the time of the accident. Seal asserts that the position of the car seats plays an important factor in the outcome of this case.
This matter is governed by Miss.Rules of Evidence, R. 401-403. In Murriel v. State, 515 So.2d 952 (Miss. 1987), this court addressed for the first time the admissibility of demonstrative evidence under the newly passed Mississippi Rules of Evidence, effective January 1, 1986. Finding the new approach under the rules consistent with the pre-rules precedent, this Court stated that demonstrative evidence may be admitted at the trial court's discretion, if such evidence was reasonably necessary and material. 515 So.2d at 956, citing Baggett v. State, 219 Miss. 583, 69 So.2d 389 (1954). In a later case, Gandy v. State 373 So.2d 1042, 1047 (Miss. 1979), this court suggested that `necessary and material' be conferred as `appropriate and relevant'.
We disagree with Seal's assertion that the photographs in this instance were enough to allow the jury an adequate view of the inside of the car. Considering the testimony from the Drs. Bushkirk and Arnold, a key factor in this case is this concept of space/volume which cannot be accurately portrayed through photographs.
Other jurisdictions have allowed a view of demonstrative evidence for illustrative purposes only. In Delk v. Sellers, 149 Ga. App. 439, 254 S.E.2d 446 (1979), the Georgia Appeals Court held that the trial court did not err in allowing a model of an elevator to be used for the limited purpose of demonstrating the cam breaking devise. Because there were slight differences between the model and actual elevator, the model was not admitted into evidence. For a more recent case, see also Masters v. Dewey, 109 Idaho 576, 709 P.2d 149 (App. 1985), where the Court allowed a car seat to be admitted into evidence as an exhibit for demonstrative purposes, where the car seat aided the jurors in observing the head-rest which the accident victim hit when her car was struck. The court reasoned that how the victim sustained the injury was a material fact and thus the car seat was relevant.
In the instant case, the court allowed the jury the limited view of assessing the *249 three-dimension space/volume within the interior of the car to aid the triers of fact in weighing the contradictory testimony of the experts. Dr. Bushkirk testified that it was impossible for the two parties to have switched places within the volume of the car in one and a half seconds. Dr. Anthony, on the other hand, while acknowledging that Dr. Bushkirk's testimony was reasonable, testified that the two parties switched places.

VII
Based on the foregoing, we find no error requiring reversal and, therefore, affirm.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON, PRATHER, SULLIVAN, PITTMAN and McRAE, JJ., concur.
NOTES
[1] At dispute was the existence or non-existence of adequate space/volume within the car's interior to allow Seal and Miller to switch places within the vehicle as a result of the impact of the accident. Seal's expert Dr. Arnold testified that the two could have switched positions during the course of the impact. Dr. Arnold further testified that he could not explain how the switch was made but maintained that it could have happened in one and a quarter seconds. (R. 404, 407) Conversely, Miller's expert, Dr. Van Buskirk disputed Dr. Arnold's testimony and opined that it was a scientific impossibility for the two to have switched places due to the lack of space within the vehicle with which this feat could be accomplished. (R. 220-221)