# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 1998-KA-01278-COA

**BILLY DANIEL HARRISON, JR.**                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                             **APPELLEE**

DATE OF JUDGMENT:          08/14/1998
TRIAL JUDGE:                      HON. MIKE SMITH
COURT FROM WHICH APPEALED: LINCOLN COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:   JOHN H. OTT
                                         GUS GRABLE SERMOS
ATTORNEYS FOR APPELLEE:    OFFICE OF THE ATTORNEY GENERAL
                                         BY: W. GLENN WATTS
DISTRICT ATTORNEY:            DUNNICA O. LAMPTON
NATURE OF THE CASE:          CRIMINAL - FELONY
TRIAL COURT DISPOSITION:    08/14/1998: POSSESSION OF MORE THAN ONE
                                         KILOGRAM OF MARIJUANA WITH INTENT TO
                                         DISTRIBUTE: SENTENCED TO SERVE A TERM OF (30)
                                         YEARS IN THE MDOC; DEFENDANT PAY COURT
                                         COST, A FINE IN THE AMOUNT OF $1,000,000.00
DISPOSITION:                     AFFIRMED - 02/08/2000
MOTION FOR REHEARING FILED: 3/30/2000; denied 5/16/2000
CERTIORARI FILED:              6/12/2000; granted 9/21/2000
MANDATE ISSUED:

EN BANC.

SOUTHWICK, P.J., FOR THE COURT:

¶1. Billy Harrison was convicted for possession of a controlled substance. He appeals, arguing these actions by the trial court were erroneous: (1) the finding of probable cause for the stop of his vehicle, (2) admitting evidence that marijuana was found in his vehicle; (3) admitting evidence of a prior drug transaction, (4) admission of hearsay evidence, and (5) admitting opinion testimony. We find no error and affirm.

**FACTS**

¶2. Harrison was stopped for driving at least 67 miles per hour in a construction zone on the Interstate 55 highway in Lincoln County. The zone was marked with a 60 mile per hour speed limit, whereas the posted limit before and after the work zone was 70 miles per hour. Harrison was traveling this stretch of road at night when no workers were present.

¶3. At the time that Harrison was traveling through the construction zone in the early morning hours of May 31, 1998, Lincoln County Sheriff's Deputies Chris Picou and Anthony Foster were monitoring traffic on the highway. They were in a Sheriff's Department vehicle and had a drug-sniffing dog. The deputies were parked in the construction area watching north bound traffic. Only one lane of the construction zone was open to traffic.

¶4. Deputy Picou stopped Harrison after determining that he was speeding. Harrison explained his Texas license plates by saying that he had rented the car in Houston, Texas, and was returning to Birmingham, Alabama, after flying to Houston. The purpose of his trip, he explained, was to purchase a rare breed of dog. After requesting a driver's license check, Deputy Foster discovered that, although Harrison's license was valid, he had prior arrests. Suspecting that drugs might be in the car, Deputy Picou asked Harrison to step out of his vehicle and away from the car.

¶5. Deputy Picou asked Harrison whether he had prior arrests, whether he was carrying any illegal substances in the car and whether he would allow Deputy Foster to search the vehicle. Deputy Picou testified that Harrison assented to the search. Deputy Foster testified that Harrison denied having previous arrests by shaking his head "no." Deputy Picou then opened the rear door and smelled the odor of raw marijuana. Deputy Foster obtained Harrison's car keys to open the trunk and found 117 pounds of marijuana in a nylon-type duffle bag.

¶6. Harrison was convicted for possession with intent to distribute more than one kilogram of marijuana. He was sentenced to thirty years in prison with a one million dollar fine.

## DISCUSSION

### I. Probable cause to stop Harrison's vehicle.

¶7. The trial judge found that the stop was proper. The central question is whether the officers had probable cause to believe that a traffic law was being violated. The only traffic offense that the State has alleged is that Harrison was speeding. What is usually simple is somewhat more complicated here -- what was the legally enforceable speed limit on this stretch of highway? To give an answer, we must examine several statutes.

¶8. Harrison was driving faster than the posted work zone speed limit of 60 miles per hour, but slower than the otherwise applicable general interstate speed limit of 70 miles per hour. A statute adopted in 1997 makes it an offense "to operate a motor vehicle within a highway work zone at a speed in excess of the maximum speed limit established for the zone whenever workers are present" and signs are appropriately placed. Miss. Code. Ann. § 63-3-516 (1) (Supp. 1999). The State concedes that there is no evidence that workers were present. We agree with Harrison that section 63-3-516 was therefore not violated. That does not resolve whether his stop was proper.

¶9. This work zone speeding provision is a penal statute, i.e., it defines and sets a penalty for a specific

offense. The point that Harrison insists resolves the case is whether an offense occurred under this statute. The proper inquiry is different. It is whether the signs properly posted, which here stated 60 miles per hour at all times of day, control as to the speed limit. If so, then Harrison ignored general requirements not to speed.

¶10. To try to make the point clear, a useful analogy can be suggested. In 1989 a new section was added to the criminal statutes regarding drug offenses, which made it an offense to sell a controlled substance within 1,000 feet of a school. Miss. Code Ann. § 41-29-142 (Rev. 1993). If instead the legislature had written the statute to make it an offense to sell drugs close to a school *while children were present,* it would be very much like the statute we are applying. Under that language, Harrison's view would be that the older general statute prohibiting drug sales could not be used if a sale occurred within 1,000 feet of a school when no children are present. This analogy is not made to raise an irrelevant specter of drugs but in order to show that other existing and possible statutes surely are not to be read in the manner being encouraged here.

¶11. Another example is a statute that makes it a crime to burglarize "the dwelling house of another, in which there shall be, at that time, some human being. . . ." Miss. Code Ann. § 97-17-21 (Rev. 1994). If the only other burglary statute were a general one regarding breaking and entering buildings and the entered building was an unoccupied dwelling, the inapplicability of the specific statute for burglary of dwellings does not prevent operation of the general burglary statute.

¶12. When the 1997 legislature gave specific attention to punishing speeding in work zones when workers are present, they did not decriminalize speeding in work or construction zones when workers are absent. A specific statute occupies its defined area. The more general statutes remain for everything else; for that matter the general statute may in some circumstances remain as an alternative to the specific statute. Finding that one statute does not apply but is close, does not prevent a more general statute from being brought to bear on the offense. Statutes that provide for heightened penalties when especially egregious or dangerous means of committing a crime are utilized, do not block the operation of the remaining penal statutes. Speeding in a work zone when workers are present is especially dangerous. If that statute is inapplicable, it is still against the law to speed.

¶13. Harrison must be arguing that not only was section 63-3-516 not violated, but also that the speed limit at this location was 70 miles per hour. That means that what was posted as the speed limit was not actually the speed limit. To the contrary, a traffic violation occurs whenever anyone disobeys "the instructions of an official traffic-control device" placed along the road. Miss. Code Ann. § 63-3-313 (Rev. 1996). Another section defines a "traffic control device" as "all signs . . . placed or erected . . . for the purpose of regulating, warning, or guiding traffic." Miss. Code Ann. § 63-3-133 (a) (Rev.1996); *see Niles v. Sanders,* 218 So. 2d 428 (Miss. 1969) (exceeding a municipality-posted speed limit is a violation of a "traffic control device" under section 63-3-305). Therefore a speed-limit sign would be a "traffic-control device," whose "instruction" must be followed. An officer's perception that the instruction is being ignored creates probable cause to stop. The sign controlling this section of highway stated that the speed limit was 60 miles per hour. Harrison was driving at 67-70 miles per hour. He could be stopped.

¶14. There is another specific statute controlling highways during construction. It primarily addresses rules for detours, but then allows a less disruptive alternative:

The [executive director of Department of Transportation] is hereby authorized to close highways for

construction purposes and in emergencies, and shall select, lay out, maintain, and keep in as good repair as possible suitable detours by the most practicable route . . . . *The director shall place or cause to be placed explicit directions to the traveling public* during repair of said highway or road under process of construction. . . . *The director is also authorized, subject to the approval of the commission, to make reasonable rules and regulations to keep highways under construction open to traffic where such action is deemed to be practical and desirable.*

Miss. Code Ann. § 65-1-71 (Rev. 1991) (emphasis supplied). The evidence reveals that this highway was undergoing repairs. Signs had been erected controlling the use during construction. Instead of being sent on a detour, drivers were allowed to continue using the highway subject to the "reasonable rules and regulations" that were established. A lower speed limit during construction regardless of whether workers are present is a reasonable rule.

¶15. One final relevant statute allows the Transportation Commission to adopt "rules, regulations and ordinances for the control of and the policing of the traffic on the state highways," the violation of which constitutes a misdemeanor. Miss. Code Ann. § 65-1-8 (c) (Supp. 1999). This delegation of general regulatory authority is understandable, indeed indispensable unless the legislature must enact every highway traffic rule.

¶16. One statute requires warning signs to be obeyed; another statute allows special rules to be created for construction zones and for "explicit instructions regarding them to be posted"; still another provides for general traffic rules to be adopted. Here, the warning signs posted day and night provided for a 60 mile per hour speed limit. The presumption is that the direction given by these signs, namely, that a continuous lower speed limit existed, properly expressed controlling traffic regulations. "Presumption" is the concept, since every time that a traffic control sign of any type is ignored, the State need not show that a specific order appears in agency minutes authorizing the message on the sign. There is no defect arising from the fact that the signs are the limit of the evidence.

¶17. To hold that section 63-3-516 is the only applicable statute, the rule that specific statutes control over general ones might be invoked. However, we hold that the specific statute does not apply. There is no rule of statutory construction that an inapplicable statute ever controls over an applicable one. There is a general speeding statute -- one must obey posted speed limits. There is a specific statute that sets a $250 fine when a driver speeds in a work zone and workers are present. The "occupied work zone" speeding statute did not apply so the general one does. There simply is no specific over general issue.

¶18. The point could be altered into an argument that the specific statute is the exclusive one controlling work zone speeding. However, the statute does not state that "it is unlawful to exceed the posted work zone speed limits *only* if workers are present," just as the earlier proposed hypothetical statute would not have stated that it is unlawful to sell drugs in a school zone only if children are present. When the specific offense occurs, the specific penalty applies. Before the 1997 statute created a new penalty for some work zone speeding, the general prohibition of ignoring traffic signs would have applied.

¶19. The 1997 statute only partly covered all the speeding that could occur in a construction zone. To make it go further than its precise wording would result in a repeal by implication of the general speeding statutes'

coverage as to the remainder. Few rules of construction are better established than that repeals by implication are disfavored. *Associated Press v. Bost,* 656 So. 2d 113, 115 (Miss. 1995). Here the repeal would be to exempt conduct that formerly was prohibited. Instead of a repeal, we apply this mandate:

> When different code sections deal with the same subject matter, these sections are to be construed and interpreted not only so they harmonize with each other but also where they fit into the general and dominant policy of the particular system of which they are part.

*Ashcraft v. Board of Supervisors of Hinds County,* 204 Miss. 65, 36 So. 2d 820 (1948), quoted in *Andrews v. Waste Control, Inc.,* 409 So. 2d 707, 713 (Miss. 1982).

¶20. The obvious harmony with the "general and dominant policy" of highway safety regulations is that traffic control signs are to be obeyed. It is not just a policy; it is a statutory command. Miss. Code Ann. § 63-3-313 (Rev. 1996). Harrison wants us to conclude that construction speed limits may be ignored when workers are not present. A driver presumably only knows whether a worker is present when he sees one, which means the warning signs will be ignored until that happens. We hope the worker will be seen in time. The higher fine in fact applies whenever a worker is present, whether observed or not. Moreover, hazards exist even when workers are gone, *e.g.,* torn-up pavement; one lane of traffic on an interstate highway; heavy equipment, tools, and barricades in place; bumps, dips, and narrow bridges. It often is simply not safe to proceed at anything near the "normal speed" irrespective of workers. Yet no matter how significant the hazard, how indispensable to safety a driver's slowing might be, Harrison in effect argues that the Transportation Commission is statutorily compelled to permit full speed ahead unless workers are present.

¶21. The decision regarding construction zone speeds is for the legislatively empowered agency to make. If lower limits only for the workday are appropriate, that decision can be reflected at day's end by removing the signs or laying them face down. The dominant policy of highway safety calls on the agency to decide when the reasons for the speed limit apply. The motorist does not have that option.

¶22. These principles mean that speed limit signs properly authorized and placed are applicable all the time and not on a case-by-case basis, though the instruction on the sign itself may be limited. For example, the statute immediately prior in the Code to the one in question provides that local authorities may set special speed limits for travel on the public roads within their jurisdiction, including limits for streets near schools and churches. Miss. Code Ann. § 63-3-515 (Rev. 1996). "The order or resolution setting such speed limits may provide that such limits are only effective during specified times of the day, days of the week and months of the year." *Id.* A different section states that local authorities may place their own traffic control devices that give notice of local restrictions that have been adopted. Miss. Code Ann. § 63-3-305 (Rev. 1996).

¶23. If the sign did not show a time or other limitation, a driver might have a defense if the local ordinance was restricted in a manner not reflected on the sign, making the speed limit inapplicable to the charged event. In our situation, this state-authorized sign on its face provided no time restrictions. For the reasons already shown, none arose from section 63-3-516 either. Nothing has been shown by Harrison to overturn the presumption that the sign meant what it said.

¶24. We find no significance to the failure of the State at trial to rely upon these statutes. That omission does not override another general rule that we should uphold lower court action, including the finding of probable cause here, based on different legal reasons than were utilized below. *Patel v. Telerent Leasing Corp.,*

574 So.2d 3, 6 (Miss. 1990). If a search was supported below because of probable cause to suspect speeding, the fact that the trial judge relied on the wrong statutory section does not invalidate the finding. The initial time that the wrong statute might have been used was at the roadside. In fact, the record indicates that the officers had no specific statutory section in mind. For a valid arrest, what is necessary is that "the facts available to the officer at the time of arrest[,] warrant a man of reasonable intelligence and caution to believe that an offense had been committed" by the person arrested. *Ellis v. State,* 573 So. 2d 724, 726 (Miss. 1990), paraphrasing *Beck v. Ohio,* 379 U.S. 89, 96 (1964). This is an objective test, not a subjective one of what these particular officers knew or believed. Charles H. Whitebread & Christopher Slobogin, Criminal Procedure § 3.03 (1993) at 75. These officers had valid grounds to stop Harrison even if at the scene they could not name the specific statute.

¶25. Regardless of the proper fine, Harrison was speeding. That is sufficient to allow the stop, the search, and the conviction.

## II. Failure to suppress the marijuana found in the rental car.

¶26. Harrison's argument that the marijuana found in his rental car's trunk should have been suppressed as evidence is based solely on his argument that the traffic stop was improper. The traffic stop was proper. There was probable cause to search the car, and this argument fails.

## III. Admission of evidence of a prior drug transaction.

¶27. Evidence was admitted that Harrison had a misdemeanor conviction for possession of marijuana in Alabama. The purpose argued for its admission was to show that Harrison had prior experience with the drug and could be expected to be familiar with its odor. Although Deputies Picou and Foster both testified that there was a strong smell of raw marijuana inside the passenger compartment of the rental car, even with the trunk lid closed, Harrison testified in court that he never smelled it. In fact, Harrison's attorney stated in his opening remarks that Harrison had nothing to do with putting the marijuana in the trunk of the car and that it must have been there when he rented the car, because he had no knowledge of it.

¶28. The relevant evidentiary rule is this:

(b) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

M. R. E. 404(b).

¶29. The comment to the rule further provides:

These past acts introduced into evidence may be ones for which the person in question was either convicted or not convicted. All of the exceptions in Rule 404(b) have been recognized and applied on numerous occasions by the Mississippi Supreme Court. Evidence of another crime, for instance, is admissible where the offense in the instant case and in the past offense are so inter-connected as to be considered part of the same transaction. *Neal v. State*, 451 So. 2d 743 (Miss. 1984). The court has consistently recognized that evidence of a prior crime or act may be admitted to show identity, knowledge, intent, or motive. *Carter v. State*, 450 So. 2d 67 (Miss. 1984).

Mississippi Rules of Evidence 404(b) cmt.

¶30. Harrison interprets this rule to require that "the other crime must be so inter-related with the crime being tried so as to constitute a single transaction," citing *Lockett v. State*, 517 So. 2d 1346 (Miss. 1987). In *Lockett*, the two crimes were murders of a married couple, committed the same day as part of the same transaction. In that case, the court explains that prior crimes can be admitted when the crimes are interconnected *or* to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Both are not needed. The purpose for the use here was quintessentially a Rule 404(b) purpose.

¶31. There is a second step, however. Evidence with probative value is not admissible if improper prejudicial effect substantially outweighs that value. M.R.E. 403. One case cited by Harrison states that "evidence not admissible because prejudicial under Rule 403 may nevertheless be received if it qualifies under Rule 404(b)." *Jenkins v. State*, 507 So. 2d 89, 92 (Miss. 1987). That was later corrected this way : "In *Jenkins v. State* . . . we misspoke when and to the extent we implied Rule 404(b) provided a test of admissibility independent of Rules 401-403. Evidence admissible under Rules 404 or 405, for example, must independently pass muster under Rules 401-403." *Heidel v. State*, 587 So. 2d 835, 845 (Miss. 1991).

¶32. At trial the court engaged in an extensive review with counsel regarding the probative value, relevance, and prejudice of this evidence. The conclusion was this:

> COURT: They are within the time frame for them to be considered as being the admissible ten year. Ten years is the time limit that the cases allow 404(b) evidence, within ten years. So, within the time frame it would be satisfactory. Certainly, both of the charges and this indictment would involve the defendant as being in the proximity of marijuana to know what it smelled like. In view of the opening statement that he didn't know the marijuana was -- the 117 pounds of marijuana was in the car, I think it would be relevant. It would -- its probative value would outweigh any danger of misunderstanding or prejudicial effect in this instance.

We find no error in the admission of evidence of an Alabama marijuana conviction.

## IV. Admission of hearsay evidence.

¶33. Harrison states that two hearsay statements were admitted improperly. In the first, Deputy Foster was allowed to testify that he had checked Birmingham telephone listings to determine if there was a listing for the business called "Mobile Profection" that Harrison claimed to own with another person. Foster testified that he called directory assistance and "asked them for a listing for the business and they stated there was not." The officer did not personally examine any printed directory.

¶34. Based solely on a statement made to him over the telephone, the witness stated something as fact. That is a hearsay statement. M.R.E. 801(a). The State argues that this was not being admitted for its truth, but only for the fact that it was said. However, we find no relevance to what a directory assistance operator told this officer other than the fact that there was no listing.

¶35. First, the information in a printed directory is admissible if it is a "data compilation . . . made . . . from information obtained by, a person with knowledge, if kept in the course of a regularly conducted business

activity, if it was the regular practice of that business activity to make the . . . data compilation . . . ." M.R.E. 803(6). The hearsay statement by an operator who examines what is probably a computer database raises some additional issues. If the question is whether the records maintained by directory assistance reveal this business, two possible errors exist when reliance is placed on what the officer was told. There could be an error of understanding, either by the officer or the operator, concerning what was said by either party during the conversation. Else there could be an erroneous statement from the operator, through neglect or otherwise in reviewing and relating what was found. A third problem, of whether the officer was telling the truth about the existence and content of the telephone conversation, is strictly a credibility matter which applies to the relating of any hearsay. Thus, at least in the first two ways it can be seen that relying on an oral statement over the telephone is not the same as examining a printed directory.

¶36. Nonetheless, we find no harm to what occurred. The defense at trial was that Harrison was oblivious to the strong odor of marihuana in his car and unaware of its presence while on an innocent trip. Whether the Birmingham business existed or not ultimately was very much a side issue. It is true that making the jury believe that he fabricated the Birmingham business name does undermine his credibility. Still, this was a minor point, for which Harrison had means to prove the contrary such as his attorney's having someone call directory assistance during a recess in the trial. We find little significance to the matter. To the extent Harrison perceives it differently, he took no steps at trial or in a motion for new trial to establish an easily provable contrary point. Consequently, we conclude that no fundamental right was affected by this hearsay.

¶37. The second example of hearsay is that Deputy Foster testified that he saw Harrison shake his head "no" after hearing Deputy's Picou ask whether or not he had any previous arrests. This is not hearsay. Unlike the directory assistance information, the point of relevance here is that the question was asked and Harrison non-verbally responded. Since it was a question, Picou's part of the conversation was not an assertion and is not hearsay. The jury was told that Harrison's answer denying former arrests was actually not true. Thus neither part of the conversation was being admitted for the truth of matters asserted, but only for the fact of assertion.

## V. Opinion testimony

¶38. Harrison asserts that Officer Picou was allowed to give expert opinion testimony although he was not qualified as an expert by the court. The issues were the speed at which Harrison was driving and the quantity and probable use of the marijuana. Officer Picou was not listed in discovery, not presented, and not qualified as an expert witness.

¶39. In order to testify as an expert, a witness must first be offered as such and the qualifications established and, if desired, rebutted by opposing counsel. M.R.E. 702. That was not done here. The State argues that the two matters were actually lay opinion testimony. The issue for admitting lay opinions is solely whether they are rationally based on the witness's perceptions and would be helpful. M.R.E. 701. To be lay opinion, though, there must be no specialized knowledge required:

> There is a bright line rule. That is, where, in order to express the opinion, the witness must possess some experience or expertise beyond that of the average, randomly selected adult, it is a Miss.R.Evid. 702 opinion and not a Rule 701 opinion. *Mississippi State Highway Commission v. Gilich*, 609 So.2d 367, 377 (Miss.1992) (lay opinions are those which require no specialized knowledge however attained); *Seal v. Miller*, 605 So.2d 240, 244 (Miss.1992) (question calling on police officer to respond based on experience as an officer investigating accidents is by definition not a lay

opinion.) *Wells v. State*, 604 So.2d 271, 279 (Miss.1992) ("[I]f particular knowledge ... is necessary to assist the trier of fact ... then such testimony would never qualify as a lay witness opinion under M.R.E. 701.")

*Sample v. State,* 643 So.2d 524, 529-530 (Miss. 1994). Among the problems of blurring the distinction is that expert opinion testimony must be noted in discovery to provide an opportunity for the opposing party to prepare a rebuttal. *Id.* at 530; URCCC 9.04 A 4.

¶40. On the matter of Deputy Picou's testimony that the quantity of drugs was too large for personal use, this is quite similar to the problem in *Sample*:

> Corr was allowed to express his opinions concerning the value, normal street usage and customary packaging of marijuana based upon his training and experience as a narcotics officer. He was, therefore, a Rule 702 expert. *Wells v. State*, 604 So.2d at 279. Under this Court's policy, he should have been tendered as such to have his qualifications tested through voir dire before being allowed to offer the expert opinions. *Roberson v. State,* 569 So.2d at 696. Corr was not so tendered and, in the failure to require that procedure, the court erred.

*Sample*, 643 So. 2d at 530.

¶41. The objection raised at trial to Picou's testimony was that it went beyond the officer's experience and that he was not qualified to give it. It was also argued that there was no scientific methodology employed or at least explained. The defense never said that the officer had not been qualified as an expert under Rule 702 nor that he had not been listed as an expert in discovery. Instead counsel argued that this question went beyond what experience and training would have taught the officer. The trial judge stated that "from the officer's experience that he's testified to, that hundreds of arrest[s], that he's qualified to give an opinion."

¶42. The trial judge's characterization of the basis for the opinion is precisely correct. It is that basis -- unusual experience beyond that of a lay person -- that makes this expert testimony.

¶43. The trial counsel's characterization of the issue was not correct. It was as if the counsel was arguing that the witness, though qualified as an expert, did not have the kind of expertise for this information. This failure to raise the discovery issue and the need to qualify the officer as an expert under Rule 702 are not just technical failings. Had the court been pointed to the specific problems, there were means to address them. If the discovery violation had been raised, the appropriate procedures for responding to such a problem, including a possible continuance, could have been followed. URCCC 9.04 I. Had the defense counsel been able to proceed without a continuance, the proper procedures for qualifying this witness as an expert could have been followed. M.R.E. 702. The trial judge found Picou qualified as an expert based on the information available when he overruled the objection to this testimony.

¶44. We will not reverse a trial judge based on an appellate objection that was not presented at trial. *Oates v. State,* 421 So. 2d 1025, 1030 (Miss. 1982). The reason for that rule is well exemplified here. Though qualifying an expert is an important procedural requirement, it is probable that following the requirements here would have led to this witness being accepted as an expert. It is too late to point out the oversight now.

¶45. The other item of expert testimony was that the officer paced Harrison's vehicle and found him to be speeding. The initial few objections to this testimony were that the proper predicate had not been laid. The court told the prosecutor to rephrase the questions. After some further testimony, the defense counsel

objected that the officer was giving his opinion. That was overruled.

¶46. For the same reason as indicated in the previous discussion, we find this to be an inadequate objection. The possibility that a discovery violation had occurred regarding an expert witness simply was not raised. Had it been, a recess for examining the officer and then a decision reached on whether a continuance was needed might have occurred. If the issue raised at trial had been that the officer would need to be offered and qualified as an expert, that also could have been attempted by the State. Neither specific objection was made and therefore neither specific remedy was applied.

¶47. There is a possibility that this latter evidence was not expert testimony. What the officer stated was that he got behind Harrison's vehicle and reached the speed that Harrison was going. A lay person, based on normal experience and skills, might well be able to modify the speed at which he or she is driving a vehicle such as to maintain a constant distance behind another vehicle. A lay person can understand that process and testify about the speed if the witness successfully conducted a pacing. If so, then there is no need to have presented Picou as an expert before this testimony:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to the clear understanding of his testimony or the determination of a fact in issue.

M.R.E. 701. We need not decide the issue, which is impacted by some statements in the testimony that there are reference points that officers observe in the process of pacing. Exactly what those are and whether they are significant may be a matter for an expert to address.

¶48. **THE JUDGMENT OF THE CIRCUIT COURT OF LINCOLN COUNTY OF POSSESSION OF MORE THAN ONE KILOGRAM OF MARIHUANA WITH INTENT TO DISTRIBUTE AND SENTENCE OF 30 YEARS IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND FINE IN THE AMOUNT OF ONE MILLION DOLLARS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO LINCOLN COUNTY.**

**McMILLIN, C.J., LEE, MOORE, AND PAYNE, JJ., CONCUR.**

**DIAZ, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY KING, P.J., BRIDGES, IRVING AND THOMAS, JJ.**

DIAZ, J., DISSENTING:

¶49. I respectfully dissent from the majority opinion since I believe that no probable cause existed for the deputies to stop Harrison's car.

¶50. Mississippi Code Annotated Section 63-3-516 (Rev. 1996) states in pertinent part that:

> (1) It shall be unlawful for any person to operate a motor vehicle within a highway work zone at a speed in excess of the maximum speed limit specifically established for the zone *whenever workers are present and whenever the zone is indicated by appropriately placed signs displaying the reduced maximum speed limit*.

(emphasis added). In *State v. Traylor*, 100 Miss. 544, 544, 551 56 So. 521, 523 (1911), the Mississippi

Supreme Court outlined the construction of statutes when presented for judicial interpretation: "The court has no right to add anything to or take anything from a statute, where the meaning of the statute is clear. . . . The law is that criminal statutes must be strictly construed. Such has been the law from time immemorial."

¶51. In the case *sub judice*, for the highway construction zone in question to have a sixty mile an hour speed limit, two necessary conditions must be present: (1) workers must be present and (2) signs indicating the reduced maximum speed limit must be appropriately displayed. Here, the evidence shows that no workers were present in the highway construction zone at 1:50 a.m. when Harrison was stopped for "speeding." The State asks this Court to find that highway workers were constructively present during the early morning hours of May 31,1998, in order to avoid reaching an absurd result with regard to the interpretation of the statute. Indeed, an absurd result would be reached by this Court if we were to interpret the statute in question. In accordance with the reasoning in *Traylor*, this statute is not ripe for judicial interpretation since the requirements and meaning of the statute are clear from its face. Furthermore, case law provides that criminal statutes are strictly construed. *Traylor*, 100 Miss. at 544, 56 So. at 523; *see also Harris v. State*, 179 Miss. 38, 40, 175 So. 342, 344 (1937) (holding that courts cannot restrict or enlarge the meaning of an unambiguous statute).

¶52. The majority regards Section 63-3-516 as a specific statute that provides for an enhanced penalty for speeding in a construction work zone. However, Section 63-3-516 is a statute that specifically allows for a lower speed limit when certain conditions are met, such as : (1) workers are present and (2) signs indicating the reduced maximum speed limit are appropriately displayed. Incidentally, Section 63-3-516 also includes an enhanced penalty for speeding in these areas.

¶53. In *McCrory v. State*, 210 So. 2d 877, 877-78 (Miss. 1968), the supreme court addressed the resolution of specific versus general statutory provision conflicts: "To the extent that two constitutional or two statutory provisions overlap or conflict, specific provisions control over general provisions." *Yarbrough v. Camphor*, 645 So. 2d 867, 872 (Miss. 1994). Despite *McCrory* and its progeny, the majority argues that a specific provision such as Section 63-3-516 is subservient to "a more general requirement to obey all traffic laws."

¶54. The majority implies that the dissent is applying the appropriate speed limit statute on a case-by-case basis and predicts that motorists will ignore construction zone speed limit signs whenever workers are not present. Notably, this "ramification" is not against the law. However, since the Mississippi Supreme Court has directed us in *Traylor* to strictly construe the law, we must abide by that mandate. It is our position that the responsibility to correct any statutory conflicts resides with the drafters of the legislation instead of the appellate courts. Until then, the specific statutory provision governing construction zones with its two criteria controls over the general duty to follow posted speed limit signs.

¶55. During the pretrial motions hearing, the assistant district attorney defended the traffic stop as one based on the mistaken belief of the deputies that the highway construction zone speed limit was sixty miles per hour. She stated, "This law was enacted effective July 1st of 1997. Both of these officers received their training a few years prior to that. And as far as they knew, it was illegal to exceed the posted speed limit in a construction zone." "It is fundamental that all persons are presumed to know the law and we have held that *law enforcing officers* have no immunity from this presumption." *McNeely v. State*, 277 So.2d 435, 437 (Miss. 1973)(emphasis added).

¶56. Had Harrison been speeding or violating other traffic laws in the deputies' presence, a traffic stop

would have been appropriate. However, no evidence was presented that this was the situation. Despite the best efforts of the State to persuade this Court otherwise, the maximum legal speed limit was seventy miles per hour where Harrison was stopped. In order for the speed limit to have been sixty miles per hour in the construction zone, the State had to prove that highway workers were present and reduced speed limit signs were displayed when Harrison was stopped. Since the State failed to show that workers were present thereby reducing the speed limit, no probable cause existed to stop Harrison who was traveling at a rate of sixty-seven miles per hour. Accordingly, I would reverse and render the decision of the Lincoln County Circuit Court.

**KING, P.J., BRIDGES, IRVING AND THOMAS, JJ., JOIN THIS SEPARATE OPINION.**