¶ 45. With due regard for the majority opinion, I find myself compelled to dissent as to issues I and IV. Each of these issues relates to what was allegedly lay opinion testimony admitted under M.R.E. 701. M.R.E. 701, provides:
 If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. *Page 1180 
I. WHETHER THE TRIAL COURT ERRED IN FAILING TO SUSTAIN THE DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY AND EVIDENCE OF STATE'S WITNESS STEVE BYRD OF THE MISSISSIPPI CRIME LAB, FIREARMS SECTION, AS AN EXPERT WITNESS.
 ¶ 46. On March 8, 2002, the trial judge ordered the State to give the defense the mandated written designations concerning expert witnesses. This information was to be provided to the defense no later than 60 days prior to trial. The designation of Byrd as an expert was done the afternoon prior to trial, although his written report had been previously given to the defense. The State indicated that Byrd was not being called as an expert witness.
 ¶ 47. In response to the defendant's motion to exclude Byrd's testimony, the trial judge ruled that Byrd's testimony would be allowed, but not as an expert. He directed the State not to go into matters which would give the impression that this was expert testimony.
 ¶ 48. In order to understand why I believe that it was error to admit Byrd's testimony under M.R.E. 701, I include herein the entirety of Byrd's direct testimony. I have noted parts of that testimony for particular emphasis.
DIRECT EXAMINATION BY MS. MARTIN:
 Q. Would you please state your name for the record and for the jury.
 A. My name is Steve Byrd.
 Q. Mr. Byrd, how are you employed?
 A. I'm employed by the Mississippi Crime Laboratory in Jackson. I'm the Section Chief of the Firearms Section. I perform forensic analysis of firearms evidence.
 Q. And in that position, have you had any special type of training to allow you to perform these types of firearm-evidence investigations?
 A. Yes.
 Q. Could you tell the jury what that is.
 A. The first year I was at the laboratory, I underwent apprenticeship-type training. In other words, I worked one on one with the firearms examiners that were employed at that time. I've attended the Smith and Wesson, Rugger and Remington School, the FBI Academy in Quantico, Virginia on two occasions, and several other training seminars that have been specifically for firearms examiners.
 Q. And in your possession [sic] of the Section Chief of the Firearms Department, were you ever asked to reproduce actions on a .22 Derringer at the request of Sergeant Brett Tillman?
 A. Yes.
 MS. MARTIN: And may I approach, Your Honor?
 THE COURT: Yes.
 MS. MARTIN: I'm going to hand you what's been marked in evidence as State's Exhibit No. 2. Could you tell the jury if that's the gun that you were requested to look at.
 A. Yes.
 Q. And in your position, could you tell the jury what exactly you did with respect to that firearm.
 A. I was given circumstances by the investigating agency, and I was asked to attempt to reproduce those circumstances to determine whether or not I could cause a firearm to discharge in the manner that was described to me. *Page 1181 
 Q. And what was the scenario that you were given?
 A. If I may just read it from my report.
 MS. MARTIN:
 Q. Thank you.
 A. "Suspect in case stated he picked up Submission 1 while fighting with his spouse, and during the altercation, hit her in the head with the end of the barrel when the firearm discharged. The suspect states that the weapon was not cocked and that he struck her only one time with the firearm. Suspect states he held the firearm in his right hand, barrel pointed down, with his thumb on top of the hammer. Firearm was "— this is in parenthesis —" Firearm was gripped in a similar manner as one would home a hand grenade. Victim was shot above the right ear. Investigator requests that firearm be functioned checked to determine if it will fire in the manner described by the suspect."
 Q. And what did you do with the firearm then?
 A. I attempted to reproduce this type of discharge of the firearm with a prime cartridge in the chamber of the gun and no powder or projectile loaded into the firearm.
 Q. Okay. In a layman type way to pronounce that, could you maybe show us what you did with the gun. Could you do that in here, or would it need to be done somewhere else?
 MR. BYRD: May I approach the jury, Your Honor?
 THE COURT: Yes.
 A. For safety purposes I used a live prime cartridge so I would know if it discharged in attempting to reproduce this particular type of scenario. I just placed a live cartridge in here with no powder, that would force a projectile, out of a barrel, or the projectile, either one, for safety purposes. From the way it was described to me, I held the firearm in this manner and hit the countertop in my hand — excuse me, the countertop on several occasions, attempting to cause the firearm to discharge.
 Q. And did it discharge?
 A. I could not cause it to discharge in the manner described.
 MS. MARTIN: At this time I have nothing further, Your Honor.
 ¶ 49. The record clearly reflects that (1) Byrd was employed in a position which required some specialized training, (2) Byrd's services were engaged because he held a position which required specialized training and knowledge, (3) Byrd was introduced to the jury as an expert in the forensic analysis of firearm evidence, (4) as an expert in forensic analysis of firearm evidence, Byrd was asked to conduct a test under controlled circumstances to determine the plausibility of Marbra's explanation of the gun discharging; and (5) Byrd was to tell the jury whether or not he, with all of his expertise, could cause the gun to discharge in the manner Marbra claimed.
 ¶ 50. A lay opinion witness is one, who based upon first hand knowledge, rather than experience or training, can observe and describe an occurrence. Cotton v. State, 675 So.2d 308, 311
(Miss. 1996). He is not presumed to possess any degree of experience or expertise beyond that of the average randomly selected adult. Sample v. State, 643 So.2d 524, 530 (Miss. 1994); Palmer v. Volkswagen of America, Inc., 2003 WL 22006296, ___ So.2d ___ (¶ 82) (Miss.Ct.App. 2003). Byrd's testimony was not based on the type of first hand knowledge envisioned by M.R.E.701. The first hand knowledge envisioned by M.R.E.701 is the actual witnessing of the core event. Wells v. State,604 So.2d 271, 279 (Miss. *Page 1182 
1992). Byrd's knowledge was based upon the use of his specialized skill and training, to conduct a controlled experiment, under conditions described to him by Officer Tillman. Based upon the results of his controlled experiment, which attempted to recreate the conditions described by Officer Tillman, Byrd offered expert opinion testimony. While Byrd did not utter the magic words, "in my opinion," his testimony was in fact that of an expert.
 ¶ 51. M.R.E.701 was amended, effective May 29, 2003, to clarify that testimony based upon "scientific, technical or other specialized knowledge" is governed by M.R.E. 702. M.R.E. 701(c).
 ¶ 52. Additionally, the State made a deliberate decision to cloak Byrd in the raiment of an expert to add weight and credibility to his testimony. Where the State has presented a witness in the raiment of an expert, without formally offering him as such, the State should not be allowed to exclude him from the rules applicable to expert testimony.
 ¶ 53. Having found Byrd's testimony to be M.R.E. 702 expert testimony, the question next arises as to whether its admission as M.R.E. 701 lay opinion testimony was harmless error.
 ¶ 54. Marbra's defense was that he was holding the gun by the barrel and using it to strike the decedent, when the gun accidentally discharged. Consistent with Marbra's defense of accidental discharge of the gun, the trial court granted jury instruction S-4, which gave the jury the option of convicting Marbra of manslaughter as opposed to murder. The testimony by Byrd as to how he held the gun to conduct his test and the results of that test, were no doubt pivotal to the jury as it weighed the question of a conviction of manslaughter versus a conviction of murder. Byrd's testimony went to the heart of Marbra's defense, and therefore cannot be dismissed as harmless error.
IV. DID THE TRIAL COURT ERR IN ALLOWING, OVER OBJECTION, THE OPINION TESTIMONY OF STATE'S WITNESS, OFFICER BRETT TILLMAN, WITHOUT PRIOR DESIGNATION OF TILLMAN AS AN EXPERT AND DISCLOSURE OF HIS OPINIONS.
 ¶ 55. Brett Tillman was a police officer, who based upon his experiences and training as a law enforcement officer, was allowed to offer lay opinion testimony, pursuant to M.R.E. 701, about the amount of gunpowder residue that an individual would get upon his hands, based upon how the gun was held. M.R.E.701 lay opinion testimony is limited to matters which may be observed by the observation of any random person, Wells v. State,604 So.2d 271, 279 (Miss. 1992), rather than to matters which may be deduced based upon specialized training and knowledge. Seal v.Miller, 605 So.2d 240, 244 (Miss. 1992). Clearly the matters testified to by Tillman were not subject to random observations.
 ¶ 56. The testimony of Tillman likewise went to the heart of Marbra's defense and cannot be dismissed as harmless error. Tillman testified as to the amount of gunpowder residue an individual would have on his hands if the gun had been held as described by Marbra. This testimony must also be considered pivotal to the jury's weighing of the question of conviction of manslaughter versus a conviction of murder.
 ¶ 57. For the foregoing reasons, I would reverse and remand for a new trial.
 IRVING, GRIFFIS AND BARNES, JJ., JOIN THIS SEPARATE OPINION. *Page 1183